THE PEOPLE'S FERRY COMPANY OF BOSTON, CLAIMANTS OF THE STEAMBOAT JEFFERSON, APPELLANTS, *v.* JOSEPH BEERS AND DAVID WARNER, ASSIGNEES OF B. C. TERRY.

The admiralty jurisdiction of the courts of the United States does not extend to cases where a lien is claimed by the builders of a vessel for work done and materials found in its construction.

Whether the District Courts can enforce a lien in such cases, where the law of the State where the vessel was built gave a lien for its construction, is a question which the court does not now decide.

[MR. CHIEF JUSTICE TANEY, HAVING BEEN INDISPOSED, DID NOT SIT IN THIS CAUSE.]

THIS was an appeal from the Circuit Court of the United States for the southern district of New York.

The facts of the case are stated in the opinion of the court.

It was argued by *Mr. O'Connor* for the appellants, and *Mr. Benedict* for the appellees.

*Mr. O'Connor* made the following points:

*First Point.*—A contract to build and complete a ship or vessel is not within the admiralty jurisdiction of the United States courts, though it be intended to employ her in navigating the ocean, and even though the employer be a citizen or inhabitant of some other State or country than that in which the work is to be done; much less is a contract merely to construct the hull of an intended vessel within that jurisdiction.

I. The Constitution and laws of the United States conferred on the courts of the Union the admiralty and maritime jurisdiction, as it existed at our separation from the parent State, under a just view of English jurisprudence.

1. The attempt to tie down the jurisdiction, as a moral and legal entity, to a definition based upon the instances in which the English court has been able to exercise its powers in despite of judicial rivalry and hostility, may not have succeeded. But there is nothing inconsistent with the above proposition (I) in any of the decisions of this court which carry the exercise of admiralty cognizance beyond the limit marked by practice in England prior to and at the Revolution, nor even in any of the opinions favoring such extension. (Genesee Chief *v.* Fitzhugh, 12 How., 455; New Jersey Steam Navigation Company *v.* Merchants' Bank, 6 How., 392; 18 How., 189.)

2. No one at this day will propose to extend the admiralty jurisdiction to all cases which would fall within it according to the practice of continental Europe. And unless it is defined by a reference to the true principles of that law on which our whole judicial polity is based, we shall be left without guide or precedent. (1 Kent's Com., 369, notes, 8th ed.)

II. The laws of continental Europe in respect to claims for repairs and supplies to ships or vessels, and in respect to the question of admiralty jurisdiction, do not discriminate between foreign and domestic vessels. The law of England always has so discriminated, and this court has in like manner discriminated. In English and American law, the admiralty jurisdiction is confined to repairs, &c., furnished in a place other than the home port of the vessel. (The Nestor, 1 Sumner, 79; Justin *v.* Ballam, 2 Ld. Raym., 806, first resolution; 3 Hagg., 144; 3 Knapp P. C. R., 194; Act of 3d and 4th Vic., ch. 65, sec. 6; The Alexander, 1 W. Robinson, 288; ib., 360; Ward *v.* Peck, 18 How., 267; Benedict's Adm., sec. 108; Zane *v.* The Brig President, 4 Wash. C. C. R., 456; The General Smith, 4 Wheaton, 438; 12th Admiralty Rule of this court; 1 Curtis's Com., sections 51, 52.)

1. The Roman civil law and the law of several modern nations, estimating less highly than the English common law the free and unrestricted circulation of property, gave a lien on solid grounds of natural equity to the producer, preserver, and improver of a thing, and to him who lent money for any of these purposes. This policy extended alike to every description of property. (Cushing's Domat, secs. 1741, 1745, 1765; The Nestor, 1 Sumner, 79; Bee's Ad. Rep., 78; Code Civil of Napoleon, sec. 2103, subs. 4, 5; French Com. Code, Book 2, art. 191, sec. 8; Civil Code of Louisiana, art. 3194, 3204 to 3215; Vanleuwen's Roman Dutch Law, Book, 4, ch. 13, sec. 8.)

2. The English common law, on the contrary, favoring the free negotiation of property, gave no lien in any of these cases,

unless the claimant retain possession of the thing. And even those nations of Europe which adopted the civil law as the general basis of their jurisprudence, and yet held intimate relations with England, assimilated their laws to the English policy. (Lickbarrow *v.* Mason, 1 Smith's Leading Cases, 430; Phila. Law Reg., 1856, vol. 4, p. 577; Bell's Com., secs. 1385, 1387, 1397.)

3. There was no reason in any other nation than England for a dispute as to the jurisdiction of the admiralty where the *right* existed; but in England that jurisdiction, if not kept within defined limits, encroached upon trial by jury. In this country, there is an additional objection. Every assumption of admiralty cognizance is an encroachment upon the jurisdiction and independence of the States.

III. Although the law and policy of continental Europe, overlooking as immaterial the distinction between foreign and domestic owners, gave a lien for building or constructing a vessel, as well as for repairs, and overlooked, as equally immaterial, in which court the claim was prosecuted, it is clear that, according to the principles and policy both of English and American law, the *builder* has not any lien by the general law, and cannot prosecute in the admiralty for his compensation. (The General Smith, 4 Wheat., 438; Robinson *v.* Hosier, 4 B. and Ald., 344; Wood *v.* Russell, 5 B. and Ald., 942; 2 Story's R., 462.)

IV. Building or constructing a ship for a citizen or a foreigner is a purely local matter, merely tending toward and not in any way directly connected with maritime commerce. It is not within the reasons on which admiralty jurisdiction is founded. (St. Jago de Cuba, 9 Wheat., 409; Shrewsbury *v.* Two Friends, Bee, 435; Hurry *v.* John and Alice, 1 Wash. C. C. R., 296; 2 Woodb. and Min., 110.)

*Second Point.*—The builders had no lien by any rule of maritime law, nor by the common law, nor by any local law, nor by any contract.

I. The lien recognised in some of the maritime codes of continental Europe is not admissible in this country.

II. They relinquished their builder's lien under the common law by parting with the possession.

III. There is no statute or other local law in New Jersey giving a lien to shipwrights.

IV. The laws of New York giving a lien to shipwrights apply only to the case of debts contracted within the State of New York, and for work done or materials furnished in the State of New York. (2 R. S., 493, sec. 1.)

V. The contract created no lien. The special provision

on that subject contained therein was designed for other objects.

1. Although a vessel is to be paid for by instalments as the work progresses, it depends on the terms of the contract whether any title is acquired by the employer before final delivery. This is especially so as to materials provided but not applied to the vessel. It was designed to settle this question in favor of the employer as security for his advances. (Andrews *v.* Durant, 1 Kernan, 45; Spanish Co. *v.* Bell, 34 Eng. L. and Eq., 188; Wood *v.* Bell, 36 Eng. L. and Eq., 148.)

2. The second branch of this clause was designed to save the common-law lien of the mechanic from the possible implication of a relinquishment in consequence of the transfer of the ownership to the employer. The common-law lien remained until the mechanic parted with the possession.

*Third Point.*—If any lien existed at common law, by local statute or by express contract, it was not enforceable in the admiralty.

I. If there was a lien by force of the contract, it was not a maritime lien. (Leland *v.* Medora, 2 Wood. and Min., pp. 107 to 113; Hurry *v.* John and Alice, 1 Wash. C. C., 296; 2 Brown's Civ. and Adm. Law, p. 116, 95; Bogart *v.* The John Jay, 17 How., 400; Schuchardt *v.* Angelique, 19 How., 241.)

II. Where State law, either positive or customary, gives a lien, there is no ground for enforcing such lien by admiralty process.

1. When the lien is given by the State law, that same law provides adequate means for enforcing it. (1 Peters Adm. Dec., 228; Barque Chusan, 2 Story, 462.)

2. Enforcing the lien of the State law by admiralty process would lead to inconvenient conflicts of power. (The R. Fulton, 1 Paine's C. C. R.; 623.)

3. Furnishing repairs, &c., to *foreign* vessels is the only case in which the maritime law gives a lien. If it was necessary for the purposes of maritime commerce, the lien would be given in other cases. That a lien for repairs, &c., in other cases, is not needed, proves that such liens, when given *by other laws*, are not in their nature maritime. And there is a great incongruity in enforcing by admiralty process a title unknown to the admiralty law.

4. Although it has been often decided in the circuits that a lien for repairs, &c., not known to the general maritime law, and merely arising from State legislation, might be enforced in the admiralty, that point has never been conclusively determined in this court. (Peyroux *v.* Howard, 7 Pet., 341; Barque Chusan, 2 Story's R., 463.)

*Mr. Benedict's* points were the following:

*First.* Liens upon vessels for maritime services to the vessel are beneficial to the general interests of commerce, are founded in natural equity, and are favored in law, especially in the admiralty. (The Calisto, Davies Rep., 38; The Atlantic, Crabbe Rep., 442; Emerigon, Mar. Loans, ch. 12, sec. 3.)

*Second.* The building of a vessel and the repairing of a vessel are in principle the same thing. Repairing is reconstruction *pro tanto.* They are both of them making fit for maritime service as a vessel, what was before unfit for that service. Both furnish to the owner a serviceable vessel for the purpose of commerce. Both are labor and materials made part of or incorporated in the vessel of another. Both are necessaries, in the legal sense of that word. They are reasonable and proper services for the owner to the vessel, to make her more available to him as an instrument of maritime commerce, always subject to the perils and laws of the sea. In the sense of absolute necessaries, they are neither of them necessaries. They are necessaries just as the various articles of comfort and luxury which make up the stores of a ship or a family are necessaries, although mere bread and water are all that are necessary to sustain life.

They are united and classed in the books of maritime law as like maritime causes of action or services of the same nature, and declared to be a lien upon the vessel by the maritime law, from its earliest period, "Building, amending, saving, victualling." (Benedict Ad., secs. 95, 270, 271, 272; Flanders Mar. Law, secs. 242, 249; Dig. Lib., 42, lit. 6, sec. 11; 1 Boulay Paty, 121; Consulato, Ch. 32; Ord. de la Marine Art., 17; Cleirac, 351, 352; Davies Rep., 29; The Nestor, 1 Sumner Rep., 79.)

The State laws give liens—New York for "building, repairing, fitting, furnishing, and equipping," (2 Rev. Stat. N. Y., 491, sec. 1, subd. 1;) New Jersey, same as New York, (Laws of New Jersey, 1857, 382;) Pennsylvania, "building and fitting ships," (New Brig, Gilpin, 540;) Maine, "building or repairing," (The Calisto, Davies, 29;) Louisiana, "construction or repair," (7 Pet. Rep., 341, Peyroux v. Howard.)

"All matters that concern owners and proprietors of ships, as such, and shipwrights, are within the admiralty jurisdiction." (Godolphin, 43; Benedict Adm., sec. 264.)

The civil law, the general admiralty law, the British admiralty law, the lien laws of the States, the decided cases in our own courts, all concur. For obvious reasons, cases to enforce the builder's lien are much more rare than those for repairs.

Nothing is so much favored as the price for building a ship—

commerce and the State are interested in it. It is just that the builders should enjoy the lien which the law gives them. (Emerigon Mar. Loâns, ch. 12, sec. 3.)

*Third.* Any lien upon a vessel for a maritime service to the vessel may be enforced in the admiralty. (The Marion, 1 Story Rep., 73; Bened. Adm., sec. 270; Flanders Maritime Law, sec. 242.)

*Fourth.* The lien in this case is established as follows:

1. The vessel while building in New Jersey was a foreign vessel, and *so there was a lien by the maritime law.*

2. She was in the builders' hands, and so by the common law, which is the law of New Jersey, they had the *common-law or possessory lien.*

The builders never entirely gave up the possession; although they allowed the owner to take her to put in the machinery, they did not deliver her absolutely, but continued on board to finish her.

3. There was the *express lien given by the contract, "subject to a lien,"* &c., which was for the maritime cause of materials and labor for building.

4. For the work and labor done in New York there was also *a lien by the State law.*

5. As the builders had the possession in this State as builders, they had also the common-law or possessory lien in New York.

None of these liens ever existed by the mere possession or by the contract alone, but by the beneficial service to the boat, and for all these liens the remedy is complete in admiralty, because the lien has a maritime consideration or cause—the beneficial service in fitting the boat for the maritime service of the owner. No matter how the lien is acquired—if it be of a maritime character—the admiralty has the jurisdiction to enforce it. (The Marion, 1 Story Rep., 68.)

*Fifth.* This result of the ancient and modern authorities has by repeated examination become more and more clearly and firmly settled every year, for more than half a century. (Benedict Adm., secs. 257, 258, 259, 260.)

The defence in this case presents another of those instances in which an effort is made to deprive the admiralty of a large part of its jurisdiction, on the narrow English doctrines of two hundred years ago.

It cannot be necessary to reargue that general doctrine, after the investigations and decisions of the Supreme Court within the last ten or fifteen years.

*Sixth.* The possession of the vessel was never surrendered by Crawford & Terry.

1. The bringing her to New York to Small's works, and

allowing Small's men to take temporary and divided charge of her, to put in the engines preparatory to finishing her, was not a delivery. They were "to construct and build" complete in all her ship-carpenter work, and "deliver complete," which could not be done till after the engines were in. The taking charge and watching by the engine men was for a purpose of construction, and was subordinate and necessary to the legal possession of the builders for the purpose of ultimate completion.

2. The attaching her by one of the creditors of Crawford & Terry as their property, could have no effect upon the property or possession of the boat. She was the property of Small, in the possession of the libellants.

Mr. Justice CATRON delivered the opinion of the court.

This was a libel filed by Beers & Warner as assignees of Crawford & Terry, the builders, against a new steam ferry-boat, called the Jefferson, for a balance due the builders on account of work done and materials employed in constructing the hull of the vessel. It is alleged that Crawford & Terry contracted to build for Wilson Small, of New York, three ferry-boats, at Keyport, New Jersey, for $12,000 each; that they built one of them, to wit, the Jefferson; that they have a lien for the unpaid balance of the price, and that the vessel is now in the southern district of New York.

Process having been issued, the People's Ferry Company, of Boston, intervened as owners, and filed their claim and answer, denying the facts alleged.

On the trial, the defendants proved and put in evidence a written agreement for building the hulls of three vessels, between Wilson Small, who was building under a contract for the Ferry Company, and Crawford, by which the latter was to construct, build, and deliver at New York city, the hulls of the three vessels. The contract provides that the boats and materials, as soon as the same may be fitted for use, shall be the property of Small, subject only to the lien of Crawford for such sum or sums of money as may be due under the contract.

When the Jefferson was nearly finished, she was taken to New York and delivered to Small, to receive her engine; and afterwards, Crawford & Terry assigned their claim to the libellants, Beers & Warner. The balance due to the builders was over seven thousand dollars, and for this sum the libellants obtained a decree of condemnation.

The only matter in controversy is, whether the District Courts of the United States have jurisdiction to proceed in

admiralty to enforce liens for labor and materials furnished in constructing vessels to be employed in the navigation of waters to which the admiralty jurisdiction extends.

The lien reserved by the *contract* is not set up in the libel, nor can it avail, as it amounted to nothing more than a mortgage on the vessel for a debt. (Bogert *v.* John Jay, 17 How., 400.) Nor could a maritime lien for work and materials be claimed by the local law, as no statute creating any lien existed in New Jersey when the vessel was built. We have then the simple case, whether these ship carpenters had a lien for work and materials, that can be enforced *in rem* in the admiralty?

The District Court held: "That it is very clear that the admiralty law creates a lien in favor of a party who does work or furnishes supplies to a foreign ship, and that a ship owned in another State is foreign.

"That in determining the question whether such lien is created also in favor of the builder of a ship, as well as of him who furnishes work and supplies to her after she is built, the court is not controlled by the restricted jurisdiction of the admiralty courts of England, as exercised by them under the supervising power of the common-law courts. The rules and principles of the admiralty law, as administered by the admiralty courts of this country, are more enlarged—more in conformity to the principles of the civil law, as administered by the maritime nations of continental Europe.

"That, according to that law, the interests of shipping and ships, not only in their creation, but in their preservation, are of paramount importance; that the importance of this consideration is the reason why the material man who furnishes supplies for the preservation of the ship is entitled to a lien; and there is the like reason for giving a lien to him who has furnished necessaries to bring the ship into being.

"That the English law gives only the common-law possessory lien to a material man or to a builder; but the maritime law of continental Europe gives a maritime lien to those who build, supply, or repair, a ship, at least where she is a foreign ship. This is expressly stated by Boulay Paty, and this principle was acted upon for a long time by the English admiralty, before it was overthrown by the courts of common law.

"That the right of a material man who has furnished necessaries for the preservation of a foreign ship, has been repeatedly acknowledged by the admiralty courts of this country; and as the like reason exists why a carpenter should have a lien on that which by his work and materials he creates, as on that which he preserves, after he has created it; and as by the gen-

eral maritime law a lien exists in the one case, as in the other, the court must hold that Crawford & Terry had a lien upon the boat for the work done and materials furnished in building her."

Foreseeing that the cause would be brought up by appeal to this court, the circuit judge merely acquiesced in the decision of the District Court, and affirmed its decree.

The question presented involves a contest between the State and Federal Governments. The latter has no power or jurisdiction beyond what the Constitution confers; and among these, it is declared that the judicial power shall extend "to all cases of admiralty and maritime jurisdiction;" and by the judiciary act of 1789, this jurisdiction is conferred on the District Courts of the United States. The extent of power withdrawn from the States, and vested in the General Government, depends on a proper construction of the constitutional provision above cited. Its terms are indefinite, and its true limits can only be ascertained by reference to what cases were cognizable in the maritime courts when the Constitution was formed—for what was meant by it then, it must mean now; what was reserved to the States, to be regulated by their own institutions, cannot be rightfully infringed by the General Government, either through its legislative or judiciary department. The contest here is not so much between rival tribunals, as between distinct sovereignties, claiming to exercise power over contracts, property, and personal franchises.

How largely these may be involved in the contest is most apparent when we take into consideration that the admiralty courts now exercise jurisdiction over rivers and inland waters, wherever navigation is or may be carried on, and extends to almost every description of vessel which may be employed in transporting our products to market. Over all these the admiralty jurisdiction is now exercised in proper cases; and the question is, whether the contract before us is a proper case, and within the grant of Federal jurisdiction. The contract is simply for building the hull of a ship, and delivering it on the water. The vessel was constructed *and delivered* according to the contract, and was in the possession of the party for whom it was built when the libel was filed.

The admiralty jurisdiction, in cases of contract, depends primarily upon the nature of the contract, and is limited to contracts, claims, and services, purely maritime, and touching rights and duties appertaining to commerce and navigation. (1 Conckling M. L., 19.)

In considering the foregoing description, it must be borne in mind that liens on vessels encumber commerce, and are dis-

couraged; so that where the owner is present, no lien is acquired by the material man; nor is any, where the vessel is supplied or repaired in the home port. The lien attaches to foreign ships and vessels only in favor of the carpenter who repairs in a case of necessity and in the absence of the owner. It would be a strange doctrine to hold the ship bound in a case where the owner made the contract in writing, charging himself to pay by instalments for building the vessel at a time when she was neither registered nor licensed as a sea-going ship. So far from the contract being purely maritime, and touching rights and duties appertaining to navigation, (on the ocean or elsewhere,) it was a contract made on land, to be performed on land. The wages of the shipwrights had no reference to a voyage to be performed; they had no interest or concern whatever in the vessel after she was delivered to the party for whom she was built; they were bound to rely on their contract. It was thus held by the first Judge Hopkinson, in 1781, who then declared, as respects ship builders, that "the practice of former times doth not justify the admiralty's taking cognizance of their suits." (Chilton *v.* The Brig Hannah, Bee's Admiralty R., app., 419.) And we feel warranted in saying that at no time since this has been an independent nation, has such a practice been allowed. (Turnbull *v.* Enterprise, Bee's Adm. R., 345.)

It is proper, however, to notice the fact that District Courts have recognised the existence of admiralty jurisdiction *in rem* against a vessel to enforce a carpenter's bill for work and materials furnished in constructing it, in cases where a lien had been created by the local law of the State where the vessel was built; such as Read *v.* The Hull of a New Brig, 1 Story's R., 244; and Davis & Lehman *v.* A New Brig, Gilpin's R., 473; ib., 536; Ludington & King *v.* The Nucleus, 2 Law Jour., 563. Thus far, however, in our judicial history, no case of the kind has been sanctioned by this court.

For the reasons above stated, it is ordered that the decree below be reversed, and the libel dismissed for want of jurisdiction.