Ranney, J.
On the 22d day of September, 1858, the schooner “Maria E. Johnson” was seized upon a warrant issued from the court of common pleas of Lucas county, in an action commenced by Mills, Walsh & Co., under the provisions of the act, “ to provide for the collection of claims against steamboats and other watercrafts, and authorizing' proceedings against the same, by name;” and on the 30th of the same month, upon a bond regularly executed and delivered to. the sheriff in accordance with the fifth section of that act, he discharged the craft from the seizure, and delivered her into the possession of the owner. In the action thus commenced, Mills, Walsh & Co., at the November term of that court, in the same year, recovered a judgment against the schooner; and on the 6th of September, 1860, caused an order for her sale to be issued, and placed in the hands of the defendant, then sheriff of the county, who proceeded to take her from the possession of the plaintiff into his own, claiming the right so to do under the command of said order of sale. These facts constitute the ground of defense stated in the answer, and, it is insisted, are sufficient, notwithstanding the further facts stated by the plaintiff, to justify the judgment given for the defendant.
On the part of the plaintiff, it appears that the schooner was a vessel of more than two hundred tuns burden, regularly licensed an.d enrolled for the coasting trade upon the lakes, and navigable waters connecting them, and from the time of her seizure to the commencement of this action, engaged in the business of commerce and navigation, between the ports and places in different states and territories, upon these waters. That immediately after her discharge, upon the bond given in the case of Mills, Walsh & Co., she shipped on board James Wilson and others, who served as seamen, until the 1st day of November, 1858, and their wages being then unpaid, on the 3d of that month they instituted proceedings in *355 admiralty, in the district court of the United States for the northern district of New York, where the vessel then was — ■ and that upon process duly issued, she was seized and taken into possession by the marshal of the United States for that district.. That in the further progress of that proceeding, a recovery for thesé wages was had, and a decree entered for the sale of the vessel, under which, on the 16th of December, 1858, she was duly and regularly sold by the marshal, and possession delivered to the purchaser, one Thomas C. Walsh, who subsequently sold and delivered her to the plaintiff, from whose possession she was taken by the sheriff, in September, 1860.
The action in the court of common pleas was replevin, brought by the plaintiff to recover possession of the vessel from the sheriff, and upon the foregoing state of facts, that court gave judgment for the plaintiff; which being removed to the district court by petition in error, was there reversed, and the present petition is prosecuted to obtain a reversal of the judgment of the district court.
From this state of facts, it is seen, that intermediate the seizure of the vessel in the state court, and the issuing of final process for her sale, upon the judgment rendered therein, the seizure and sale in admiralty was made; and, it is evident, that the only question arising upon the record, is, which of these proceedings conferred the better title to the vessel? Upon this question, the case has been argued with unusual ability by the counsel on both sides; and while the members of the court have fully appreciated both its importance and difficulty, and have bestowed upon it corresponding attention, they have, nevertheless, been enabled to arrive at a unanimous conclusion, which they flatter themselves, infringes upon no principle already established, and preserves intact the great object of the watercraft law, and the considerations of public policy, upon which many of its provisions are founded.
The learned counsel for the defendant insists, that when the vessel was seized, upon the process issuing from the state court, it was taken into the custody of the law, which was not interfered with by its subsequent delivery to the owner upon *356 the bond given by him, and that property, in the custody of the law, can not be lawfully seized upon process issuing from any other court; and he claims that these principles have all been substantially settled by this court, in the cases of Keating v. Spink, 3 Ohio St. Rep. 105 ; Raymond v. Whitney, 5 Ohio St. Rep. 201; and Pugh v. Calloway, 10 Ohio St. Rep. 488.
If counsel is correct in his view of these cases, and of their applicability to this controversy, there can be but one result to the present case; as we have not the slightest inclination to depart from any principle settled by either of them. We think they were correctly decided, and wherever they necessarily lead, we shall feel bound to follow.
Before proceeding to an examination of these cases, it may not be inappropriate to remark, that prior to the decision in Keating v. Spink, several of the district courts of the United States had assumed the extraordinary position, that in the exercise of their admiralty powers, they were authorized to seize upon and take into their possession vessels held by state officers, under process issuing from the common law courts. Such was the case of Keating v. Spink. In that case, the steamboat was seized under the watercraft law, and was in the actual possession of the sheriff when it was taken by the marshal, and the possession surrendered to him. We held the sheriff liable for surrendering the vessel, and certainly intended to negative very explicitly the assumptions of the district court. But surely no question as to the effect of a discharge of the craft, upon a bond given under the 5th section of the act, could have arisen in that case, for the plain reason, that no attempt to procure its discharge, had been made.
Shortly before this decision was made, a similar conflict of authority had occurred, between the district court of the United States for the eastern district of Pennsylvania, and the supreme court of that state. The vessel had been seized upon a writ of attachment issuing out of the state court, and while in the hands of its officer, was proceeded against by libel in admiralty in the district court, for the recovery of seaman’s Wages. The marshal returned the warrant for her arrest *357 in these words: “ Attached the barque Royal Saxon, and found a sheriff’s officer on board, claiming to have her in custody.” Both .courts proceeded to a sale of the vessel— Carryl being the purchaser under the proceedings in the state court, and Taylor under those of the district court. In February, 1854, an action of replevin for the vessel, brought by the former against the latter of these parties, came on for trial in the state court, sitting at nisi prius, when the judge presiding ruled, that the title of the sheriff’s vendee was superior to that of the vendee of the marshal; and this ruling having been approved by the whole court (12 Harris, 264), judgment was rendered for Carryl, and Taylor prosecuted a writ of error in the supreme court of the United States to procure its reversal. In that court, the judgment of the state court, after three arguments at the bar, was affirmed. The very learned and able opinion of Mr. Justice Campbell, expressing the views of a majority of the court, has completely exhausted the subject, and has fully demonstrated that the judgment of the state court rested upon a comprehensive principle, constantly applied and acted upon in England, and in the American courts, both state and federal. Taylor v. Carryl, 20 How. Rep. 583.
But while this decision has finally settled, by the court of last resort under the federal system, the general principle, and has fully affirmed the decision of this court in the case of Keating v. Spink, which is cited and approved — yet, there is nothing, either in the facts of the case, or the reasoning of the court, to give it any greater extension than to deny to the courts of admiralty the right to interfere with the custody of property, acquired through the “seizure or manual occupation” of state officers, under process from the common law courts. The marshal found a sheriff’s officer on board, when he attached the vessel, and it was expressly found as a fact, that this possession continued down to the sale.
The case of Raymond v. Whitney takes another step in the direction of the present, and goes much further than either of the others, to sustain the position taken by the defendant’s counsel. In that case, the vessel had been discharged, upon bond and security being given, and subsequent seizures, upon *358 claims existing when she was originally attached, had been made;-and this court held, that the officer making the first seizure retained a lien upon the craft, for ¿he benefit of the plaintiff and the sureties in the bond, and the right to reclaim it, as against all prior creditors of the craft making subsequent seizures thereof. The case involved a construction of the fifth section of the watercraft law, and it was thought that the bond and discharge therein provided for, “assimilated” the proceeding more nearly to that of an ordinary delivery of property to the debtor upon a “ forthcoming bond,” than to the proceeding in admiralty, under the act of congress of March 3, 1847, where 'a complete and total discharge is effected. The opinion is strictly confined to the question arising upon the facts, and contains no intimation whatever that the same principle would be applicable to a seizure made upon a liability arising after the discharge. It is true, it is not said that it would not be; nor was it necessary or proper that the court should express any opinion upon so grave a question, without argument to illustrate it, or facts to give it application. "Very few general principles are without their recognized, exceptions and limitations, as important to be preserved intact as the principles themselves. But if in every case dependent upon a general rule, all its limitations and restrictions are to be stated, the opinion must necessarily be extended to a treatise, and a plentiful harvest of obiter dicta would alone be realized.
In the case of Pugh v. Calloway, following the principle announced in Wadsworth v. Parsons, 6 Ohio Rep. 449, and Hagan v. Lucas, 10 Pet. 401, it was held, that an officer making a levy upon property, and leaving it the hands of the debtor, upon a forthcoming bond being executed in conformity to the statute, did not thereby lose his hen upon or right of possession to the property; and that it could not afterward be seized upon process in the hands of another officer.
From this review of the authorities relied upon, it is manifest, that the defendant is authorized to assume, that this vessel, while it remained in'the hands of the sheriff, could not have been taken from his possession upon the proceedings afterward instituted in admiralty ; that property seized in execu *359 tion or attachment, and delivered by the officer to the debtor, upon the execution of the ordinary forthcoming bond provided by law, is not thereby released from the seizure, or liable to be taken upon other process in the hands of another officer; and that this principle is equally applicable to the seizure of a vessel under the watercraft law, delivered to the owner upon bond and security according to the fifth section of that act, “ as against all prior creditors of the craft, making subsequent seizures thereof.”
But it is equally manifest, that the question, whether this principle should be so extended, as to prevent her seizure for debts contracted or liabilities incurred in the course of her employment, after her “discharge” upon bond, has not been involved in any of the cases heretofore decided, and is now, for the first time, presented in this court. As the act has nowhere, in terms, declared the effect of this discharge, unless good and substantial reasons exist for making a distribution between the two classes of cases, consistency, at least, would require them to be treated alike. On the other hand, if to apply this principle of immunity from seizure to the last description of cases, would encounter the terms or subvert the policy of the enactment, it is altogether a matter of course, that the principle must cease to have application, and the statute be carried into full effect. In the opinion of the court, a decision which should deny the capacity of the craft to incur these obligations in the regular course of its employment, or its liability to seizure for their enforcement, would be not only repugnant to the express provisions of the statute, but would also make it an instrument of fraud and deception upon innocent parties, and largely subvert the considerations of public policy which the law was designed to promote.
1. Two leading objects were intended to be accomplished by allowing the craft to be returned to the owner, upon his giving ample security for the satisfaction of the claim upon which she was seized. It savea to tfie owner the use of the craft while the action was pending, and, as she necessarily exercised the public employment of a common carrier, it saved'bo the public any diminution of their ordinary facilities for the transporta *360 tion of persons and property. So far as these objects could be attained, without injury to the attaching or other creditors of the craft, a very liberal construction was due to the law. The rights of all her existing creditors, were definitely fixed by the seizure. The attaching creditor obtained priority, and the right to hold the craft subject to his process, until his debt was paid. Jones v. The Commerce, 14 Ohio Rep. 408. No other creditor, by proceedings instituted in another court, could reach her by his process, and, consequently, could lay no foundation, upon which to recover-a judgment against her. As all other creditors labored under this disability, while the craft remained in the custody of the officer, there was thought to be no good reason for holding, that their relations to the attaching creditor were changed, when, for the ease of the owner and the public advantage,'he was compelled to surrender the property upon a forthcoming bond; and, upon these the case of Raymond v. Whitney, was decided. But these considerations, it will be readily seen, can have no weight as against after incurred liabilities. When the vessel was seized, she was, necessarily, withdrawn from commerce; and was no longer in a condition to invite public confidence or gain credit, and wholly disabled from incurring any of the liabilities specified in the statute. In respect to such after incurred liabilities, the true question is, whether, when, with the allowance of the law and the action of those interested, she enters upon her new career, she does so with all the capacities, and subject to all the liabilities provided by the statute ? A moment’s attention to the palpable distinction between a watercraft, and other personal property seized upon process, will go far to furnish a solution of this question. Individuality is not given to ordinary property, and it is only seized to satisfy or secure a liability of the owner; while, m the case of a watercraft, as expressed by the court in The Huron v. Simmons, 10 Ohio Rep. 461: “ The statute treats the craft as a person, and makes it responsible, in its own name, for all debts contracted for its use, and for all injuries committed against persons or property on hand, by her officers or crew.” And again, in Keating v. Spink, it is said, the remedy against *361 it “is pursued without reference to the owner, to enforce a liability which the thing itself has incurred, and the thing itself is condemned to make reparation.” In perfect consonance with this legal character impressed upon the craft, are the decisions in Kellogg v. Brennan, 14 Ohio Rep. 72, Prevost v. Wilcox, 17 Ohio Rep. 359, where it was held, that the debts and liabilities of the craft, arising under the statute, were superior to the claims of a prior mortgagee, and must be first paid upon a distribution of the proceeds of a sale. Indeed, the universal holding has been, that the craft goes forth as the accredited representative of all interests, and that all must submit to the liabilities she incurs, in executing her mission. Whether there may not be claims, arising out of the use of the craft (as that for seamen’s wages), superior in their nature to others, and to be respected as such in making distribution, it is not now necessary to say. Of what consequence, then, is it, who is to be regarded as having the possession of this vessel ? Let it be the plaintiff who seized her, the officer, or the general owner, and yet, neither individually nor collectively were they anything more than the owners of interests in her. She was lawfully running, at the instance of those who had the right to control her, and lawfully contracted the debts upon which she was sold; and unless the statute has made an exception to her liability, in favor of owners thus situated, it is plain we can make none. On turning to the statute, we find it declared: “ That steamboats and other watercrafts, navigating the waters within or bordering upon this state, shall he liable for debts contracted on account thereof,” etc.; and that “ any person having such demand, may proceed against ... the craft itself.” To yield to the claim of the defendant, we must interpolate a clause, excepting from such liability and procedure, vessels navigating the waters within and bordering upon this state, after being discharged under the fifth section of the act. 'And to what end? Yery clearly, in our apprehension, either to make the vessel comparatively useless to the owner, or to enable him to defraud those who had confided in his ability to perform his engagements. Without seamen the vessel can not be used, and she. *362 must become indebted for their wages; she must have supplies and repairs, and may be indebted for them; and she certainly can do no business without making “ contracts for the transportation of goods or persons,” out of which heavy liabilities may arise. If her condition is known to those who would otherwise deal with her, she can get no credit, and. the law has extended a worthless privilege to the owner; but if it is not known (which would almost always be the case), and the owner obtains the labor and property of others, and large amounts of goods to be transported, upon the faith of the ordinary responsibility of the vessel for the performance of these engagements, what less than a fraud would it be to allow him, or those representing his interests by the seizure, to use a secret lien upon the craft, to defeat the security upon which those who trusted her, had relied? The fact is, that notice of the seizure and discharge, to the mass of those who would deal with the vessel, is neither contemplated by the law, nor possible in point of fact. Among the obvious things which must have occurred to the general assembly which enacted this law, was the fact, that the two great channels of water communication which border the state on either side, extend for hundreds of miles into other states and jurisdictions ; and the equally obvious fact, that the largest number of vessels, to which the law was applied, were regularly accustomed to make voyages, not only for long distances within our own borders, but for hundreds of miles beyond them. Indeed, that body has left us in no doubt, that they not only contemplated all this, but that they intended the act to extend to all the enumerated causes of action, whether accruing in this state or out of it. In 1848, in answer to a decision of the supreme court, which confined its provisions to causes of action arising in this state, they passed an “ explanatory” act, prefaced with an indignant “whereas,” in which the court is accused of limiting the beneficial operation of the law, and in fact defeating the object it was designed to accomplish; and by this act it is declared, that the law shall be so ionstrued as to authorize the proceedings therein provided, “ notwithstanding the cause of action may have accrued beyond or out of the territorial limits or jurisdiction of this state. *363 and although such craft may not have been, at the time such cause of action accrued, navigating the waters within or bordering upon this state.” With these enlarged views of the extent and beneficial character of this remedy, it would be an absolute absurdity to assume, that the legislature supposed a seizure and discharge, it may be in a justice’s court, would be noticed or known in the busy ports of a distant state; and, with this very strong language, assuring responsibility and a speedy remedy against the craft, it would be a poor compliment to their sense of justice to suppose, that they intended to defeat the just expectations which such language was calculated to inspire, from the fact that such an incident had attended the previous history of the craft.
It is, however, suggested that the seaman’s paramount lien for wages, at least, might be asserted upon the return of the craft to the state court, and first paid from the proceeds of a sale then made. But, it will be seen at once, that this might do great injustice to the creditor, who had caused her to be seized. If, under such circumstances, she may be returned, she must be received in exoneration of the bond given to procure her discharge; and if she may be returned with any incumbrance upon her, she may be incumbered to her full value; and thus the creditor be deprived of the means of satisfying his demand, either from the bond or the vessel. It is not too much to require of the owner and his sureties, that they shall return the craft substantially as they received her from the officer; and if they are unable to do so, either because she has been materially injured or incumbered in her use, after the discharge, the creditor ought to have a plain remedy upon the bond. Jurisdiction is first acquired by the seizure, and, if no bond is taken, the continued detention of the craft is indispensable to the completion of the remedy; but, when a bond is taken, although the vessel may be burned or wrecked, or sold upon liabilities arising out of her subsequent employment, or for breaches of revenue laws, the proceedings of the creditor are in no way interfered with; the bond, in such an event, becoming a substitute for the craft, and his only resource foj obtaining satisfaction of any judgment he may recover.
*364 2. Grave considerations of public policy, lead to the sami result. The interests to which this act extends, have now become immense, and they are, perhaps, owned and represented in this state more largely than in any other. All experience has shown, that laws like our own, authorizing proceedings in rem against this description of property for the ordinary liabilities, both in tort and contract, incurred in its use, are indispensably necessary, both for the interests of the owner and the security of the public. By this means, the owner is enabled to command the necessary credit to keep his vessel profitably employed, although he may be altogether unknown, or of insufficient ability to rely upon for the heavy engagements which must necessarily be assumed; while those who deal with her, if he fails to meet his engagements, have a certain a,nd reliable security, and a prompt remedy to enforce their rights.
Recent decisions of the supreme court of the United States, have made it very evident, that a large proportion of these remedies must be enforced by state laws, and in state tribunals; and, in respect to nearly all, it has been found, that the state courts are the most convenient and least expensive tribunals for the purpose. By these decisions, it has been settled, that the admiralty jurisdiction of the courts of the United States, does not extend to the enforcement of a builder’s lien for work done and materials found in the construction of a vessel; that no maritime lien attaches, even to a foreign vessel, for materials, supplies, or repairs, when the owner is present; and that none is created, in any case, where the vessel is supplied or repaired in the home port. That this jurisdiction does not extend to contracts for the transportation of goods from one port in a state to another, although carried upon a vessel regularly trading to ports and places in different states; and, finally, that no lien or liability created by state laws only, can be enforced against a vessel in the courts of the United States; and the twelfth rule of the admiralty, which had for a long time sanctioned a different practice, was found to be in conflict with the constitutional grant of jurisdiction to those courts, and has been repealed. The People’s Ferry Co. v *365 Biers, 20 How. 393; Allen v. Newberry, 21 How. 244; Maguire v. Card, 21 How. 248.
With these decisions, and the healthful decision in Taylor v. Carryl, denying to the inferior federal courts the right to interfere with property-held in custody by the state tribunals, and which, as declared by the court in the opinion of the late Justice McLean, in Hagan v. Lacas, “ has gone from the court with authority, and returned to it, bringing the vigor and strength that is always imparted to magistrates, of whatever class, by the approbation and confidence of those submitted, to their government,” all occasion for conflicts between these tribunals has been most effectually removed. In exercising this enlarged, and now completely independent authority, it should be a leading object with the state tribunals, to place themselves upon such grounds, as will give complete security to titles made under their judgments and decrees. This is alike due to the owner, that his property may bring its fair value; to the creditors of the craft, that they, as far as that value will go, may be paid their just demands; and to the purchaser, who must, ordinarily, immediately employ the vessel in other states and jurisdictions. But, to attain this desirable end for ourselves, we must challenge the comity and justice of the tribunals of other states and of the federal government, by insisting upon nothing that we are not willing to yield, and by treating the whole subject in its true light, as one which equally concerns the vast populations inhabiting thé borders of these great thoroughfares of commerce and trade. In the case of Keating v. Spink, we demanded and obtained all to which we were exclusively entitled — the unmolested right to proceed, without interference from any other court, to dispose of property held in custody by the officers of the law. The case of Raymond v. Whitney, was but another application of the same principle. As the relative rights of existing creditors of the oraft, were fixed by the seizure, we applied the principle, as between them, that the lien and custody of the officer still continued, notwithstanding the redelivery upon the forthcoming bond. To this extent the doctrine is unassailable, and strongly commends itself, both for its justice and convenience. There *366 is no good reason why creditors everywhere, who must be presumed to have dealt with a view to this contingency, should not resort to the tribunal having the craft in custody, to assert their respective claims. It involves • no denial of either the capacity or responsibility of the craft, but simply preserves to the creditor, first employing the process of the court, the preference which the same law which creates the liability, assures to him. But, where the craft, under the sanction of the law, and with the most positive assurances of responsibility, is again permitted to trade to the ports of other states, and there incur liabilities upon the faith of these assurances, which, as in the present case, may have resulted in a judicial sale, what possible reason could we give, why a title thus acquired, should be defeated by a subsequent sale in a court of this state? We could only say, that while we sent her forth with the promise, that she should be liable, and might be proceeded against, we nevertheless sent her with a secret lien, which wé claim to uphold even there, by giving our laws an extra-territorial force. Such a reason would be as bad in morals as in law; and it does not admit of a shadow of doubt, that a title thus derived, would, and ought to be, treated as a nullity by the courts of every state whose citizens were thus deceived.' Good faith, mutual confidence and sound principles, must lie at the foundation of all comity between independent tribunals; and if we would carry into effect the spirit and purpose of this law, and contribute, as we ought, to the security of titles to this description of property, derived under judicial sales, we must hold, that wherever and whenever a ship floats, upon the waters described in the statute, she carries her capacities and responsibilities with her, and is liable to be seized and sold by any court of competent jurisdiction, for any liability she may have incurred, not fixed and determined by a previous seizure. That when the law permits her to be used, after a seizure, it permits her to incur the obligations incident to the use, and binds her, and all claiming interests in her, to submit to all the consequences which may legitimately flow from such obligations. In this way, and in this way only, can she be made, what she really is, a most important instrument of commerce *367 between different states and countries; and, with this mutual confidence in, and deference for, tbe judicial proceedings of tbe courts of our sister states, and of the federal union, we may confidently expect that all collisions, so detrimental to the interests of private parties, will be avoided; and that all will feel the necessity of uniting their efforts to construct a system, at once just and uniform, in the several states interested, and calculated to give additional security to this great branch of the enterprise and industry of the country.
Eor these reasons, and with these views, we are led to the undoubting conclusion, that the seizure of a vessel in one of our courts, and her delivery to the owner on bond and security, as provided in the fifth section of the watercraft law, in nowise impairs her capacity to incur the. liabilities described in that act, or'the admiralty law, in her subsequent employment; and presents no obstacle whatever to her seizure and sale upon such liabilities in our own courts, or those of other states, or of the United States; and, consequently, that the title of the plaintiff to the vessel in controversy, derived from the sale in admiralty, is superior to that of the defendant, under the final process issued from the state court.
It follows, that the judgment of the district court should be reversed, and that of the common pleas affirmed, and judgment will be entered accordingly.
Peck C.J., and Brinkerhoee, Scott and Wilder, JJ., concurred.