THE PACIFIC.

*(District Court, E. D. Virginia.   March 4, 1881.)*

1. ADMIRALTY—MARITIME CONTRACT.
    Materials or machinery furnished, or work done, in the original construction of a ship or vessel, are not maritime in their nature, and do not give rise to a maritime contract.

2. SAME—SAME.
    Nor can they be made so by a state statute, the only effect of such a statute being to attach a lien to a contract originally maritime in nature, and not to make a contract maritime which is not so originally.

3. SAME—SAME.
    Hence, a libel *in rem*, on a contract of such a character, dismissed.

In Admiralty.

In February, 1880, Pardessus & Anthony, who were then residents of New York city, commenced the building of a steam-dredge at Astoria, in New York harbor. Her hull and flooring were completed there, and in the end of April the hull was launched and was towed to Greenpoint, in Kings county, New York, a place near Brooklyn. The timbers used in the construction of the hull were furnished by J. W. Russell, of New York city, and were delivered in New York previous to March 26, 1880. On January 24, 1881, there was still due for the timber on account the sum of $451.21. Part of the lumber used either in the construction of the hull, or afterwards in the completion of the vessel, was towed to the dredge by V. Vierow. All the timbers so towed were used in the construction of the dredge, a part after her arrival in Norfolk. The above towing was done between February 21, 1880, and September 24, 1880. On January 24, 1881, there was still due on this account the sum of $159. Whilst being constructed, a number of hands were employed about the dredge to assist in setting the machinery and to do any work that was convenient. Edward Davis and James Richardson, of New York, furnished provisions and supplies for these hands. The items in the bill of Davis ran from March 5, 1880, to September 15, 1880, and aggregated $261.77. The items of Richardson ran between the same dates, and aggregated $312.48. After the arrival of the hull at Greenpoint, Long Island, C. H. Tiebout, of Brooklyn, furnished nails, bolts, and iron, which were used in the construction of the parts of the dredge then remaining unfinished. His bill for the same ran between April 6, 1880, and September 20, 1880, and aggregated $167.03. There was also a bill of Hunter, Keller & Co., of New York, for materials furnished between August 3, 1880, and September 17, 1880, amounting to $68.54. The engines and various attachments to the boiler and engines were furnished by John J. Hayes, of Brooklyn. The articles so furnished by him were all the first of the kind, and were part of her original construction. The work of this co-libellant was furnished between March 20, 1880, and June 17, 1880, with the exception of an item of $6, furnished November 5, 1880, after the dredge was sent to Norfolk. The balance due on this claim was $1,357.76. The boiler for the dredge, and various work accessory thereto, was furnished

by Gustavus Pienez, of New York. This work was also the first of its kind put upon the dredge, and was a necessary part of her equipment as a dredge. The boiler was furnished under a written contract providing that the title should not pass until the notes given for the purchase money were paid. These notes all fell due after the boiler was delivered. The boiler was delivered about August 10, 1880. The other items ran between May 26, 1880, and September 4, 1880. This work was all done while the dredge was in New York. The balance due to Pienez was $964.49.

The anchors, ropes, and chains were furnished by H. B. Bailey & Co., of New York city, and were all the first of the kind furnished for this dredge. They were furnished between September 8 and 18, 1880, while the dredge was still at New York, and the amount charged for them was $787.45.

John F. Walsh, of New York, also did work and furnished materials in caulking the hull, while in New York, for which there was due him $176. The bucket or scoop of the dredge was furnished by Theo. Smith & Bro., of Jersey City. Various other work was also done by them, which was between the dates of June 30, 1880, and August 7, 1880. The bucket was delivered about September 20, 1880, at Jersey City. This bucket and materials were not sent by them to the dredge, but delivered at Jersey City to Pardessus & Anthony. At the time of delivery the dredge was in New York. The contract was that the bucket was to be delivered in Jersey City. The bucket was not attached to the dredge in New York, but was brought to Norfolk by common carriers. While incomplete as a dredge in this and other respects, but at the same time sufficiently complete to risk the voyage, the dredge was towed to Norfolk, Virginia. After arriving at Norfolk this same bucket, which was the first the dredge had, and was necessary to her completion as a dredge, was attached to the dredge for the first time, as also the poles used in hoisting and lowering it. Various other work, occupying in all 10 days, was done upon the dredge after arriving at Norfolk, before it was complete as a dredge and ready for work. It had left New York September 24, 1880, arrived in Norfolk September 29, 1880, and did its first work October 6, 1880. On account of its incomplete construction it worked poorly, and ran its owners heavily into debt. On December 12, 1880, it was libelled for towage, and a decree of sale obtained. Pending the sale under this decree, its owners, on January 8, 1881, sold the dredge to the National Dredging Company, of Washington, D. C., the consideration being $6,000 in cash, and the assumption by the said company of a dredging contract with the United States government held by Pardessus & Anthony. The purchase money, except a few hundred dollars, was applied by the vendees to the payment of admiralty claims against the dredge held in Norfolk; Pardessus & Anthony assuring the vendees that there were no other admiralty liens on the dredge than those held in Norfolk, and that all their other debts were mere personal obligations, of which part were for the construction and fitting out of said dredge. Immediately on the consummation of the sale, the vendee set to work improving and completing the dredge, and on the twenty-fourth of January, 1881, when the present libel was filed, had spent or contracted to spend $4,000 on it in improvements, which was swelled to $7,000 by March 1, 1881. None of the above-named parties filed in New York the specifications of lien required

by the New York vessel law. It was in evidence that the usual mode of building dredges or steamers of any kind is to build the hull, and to place the engines, boilers, and machinery in the hull after its launching, thereby saving the additional weight of the machinery in the process of launching. The value of the dredge at the date of the hearing (March 3) was estimated at $12,000 to $15,000. To build a new one like it would cost about $18,000. On January 24, 1881, the dredge was libelled by Theo. Smith & Bro., and the various other parties named above came in as co-libellants and petitioners. The National Dredging Company appeared as claimant and intervenor.

*Harmanson & Heath, John C. Baker,* and *Walke & Old,* for the several libellants and co-libellants.

*Sharp & Hughes,* for the claimants.

(1) Supplies furnished and work done for, in, or about the original construction of ships or vessels are not maritime contracts and not enforced by admiralty courts. 20 How. 393; 22 How. 129; 23 How. 494; 1 Cliff. 46; 1 Woods, 290; 2 Hughes, 81.

(2) Not being admiralty contracts, they cannot be made so by state statutes. Such statutes cannot enlarge the admiralty jurisdiction. They cannot change into an admiralty contract what the law meantime declares not to be such. The mere allegation that credit was given to the vessel does not give rise to a maritime contract. The subject-matter of the contract must be maritime. If that is the case, then the party will be presumed to have given credit to the vessel, and this presumption will add to his remedy the action *in rem.* The effect of a state statute is therefore merely to add to the remedy *in personam,* which attaches to all maritime contracts, the additional remedy *in rem.* This is a mere alternation of the means of enforcing an admiralty contract. It is not an addition to the subjects of admiralty jurisdiction. If the subject-matter of the contract is not maritime, it cannot be made so by a state statute. The following extracts from decisions prove this:

"The alteration [of the twelfth rule] applies to the character of process to be used, not the jurisdiction. * * * The states can neither enlarge nor limit the admiralty jurisdiction of the federal courts." 3 Biss. 344, 349, (1872.)

The effect of a state law is merely "to attach a lien to a maritime contract." 5 Ben. 71.

"We have determined to leave all these liens depending upon state laws, *and not arising out of the maritime contract,* to be enforced by the state courts." 21 How. 251.

"The law of the state begins where the maritime law ends," (*i. e.* the power of a state court to enforce it.) 1 Low. 377.

"It is very obvious that state legislatures have no power to confer any additional jurisdiction upon the United States courts, and it is only where the lien given by the state statute *is in respect to a subject which is maritime in its nature* that admiralty process will lie to enforce it." 2 Parsons, Ship. & Adm. 324.

"There is a wide difference between the power of the court upon a question of jurisdiction and its authority over its mode of proceeding and process. And the alteration in the rules applies altogether to the character of the process to

be used in certain cases, and has no relation to the question of jurisdiction." 1 Black, 526. See, also, pages 529–30 of same case, where it is stated that the lien given by local law must attach to a maritime contract, and that state laws would be enforced only "where it did not involve controversies beyond the limits of admiralty jurisdiction."

"An act of assembly cannot enlarge or regulate the jurisdiction of the admiralty by its own provisions. * * * A lien given by a state may be enforced by a suit *in rem* in the admiralty, *but it must be such a suit as the admiralty can entertain;* in other words, *where the contract or service are maritime,* although they are not such as would authorize a proceeding *in rem* in the admiralty, because there was no lien for them; yet when the state law supplies this deficiency and gives this lien, the court of admiralty will enforce it. This is not enlarging the jurisdiction of the court, but the remedy of the party. It does not authorize a suit in the admiralty on the subject-matter, not of admiralty jurisdiction, but only gives a particular remedy for the recovery of the debt." Crabbe, 431–3. "A state statute conferring a lien not maritime cannot confer jurisdiction on the United States courts." 22 How. 129, 132. "A court of admiralty has no jurisdiction of a suit *in rem* against a ship to recover for work, etc., done in building a ship, even though the state law gives a lien therefor." 3 Ben. 163. See, to same effect, 11 Blatchf. 451; 14 Blatchf. 24; 2 Hughes, 48, 49, 52, 54; 43 N. Y. 554, 563. "The admiralty jurisdiction *in personam* does not depend upon the question of lien." 39 N. Y. 27, and cases cited.

(3) If any state law at all applies it is the law of the place where the supplies were delivered, and not the law of the place where the furnisher resides, nor the law of the forum. Of course the *lex loci* governs. The law of Virginia, therefore, has nothing whatever to do with the case. 2 Parsons, Ship. & Adm. 326.

(4) The parties must therefore rest their case, if they have any, on the law of New York. The part of the law giving the lien may be found in 39 N. Y. 21. That law has been construed to be valid, *in so far as it confers jurisdiction upon state courts* for the enforcement of liens contracted in the building of vessels, *for the very reason that such building is not a maritime* contract. There can be no doubt of its validity in so far as it confers jurisdiction on its state courts for the enforcement of liens not maritime but common law. To that extent state laws are, of course, valid, as they do not interfere with the admiralty. All cases that may be cited in opposition to the ground taken above will be found on examination to resolve themselves into this and nothing more. 43 N. Y. 52, 56–7, 554–563.

(5) Even if any of these supplies were of a maritime nature, and the state law could give them a remedy *in rem,* they have no lien under the New York law. That law requires that, in order to preserve the lien, specifications must be filed within 12 days after the departure of the vessel from the port where the supplies were furnished. 61 N. Y. 532–3. In order to avail themselves of the law they must, of course, bring themselves within its provisions. These laws are in derogation of the general law, and must be strictly construed and strictly complied with. *The Lottawanna,* 21 Wall. 558. Not one of the petitioners filed specifications in this case.

(6) A payment on account goes to extinguish that part of the account for which there is a lien. 1 Spr. 206; 2 Parsons, Ship. & Adm. 153.

(7) Giving credit for a longer time than the lien lasts is a waiver of it. 7 Pet. 324, 344; 2 Parsons, Ship. & Adm. 152.

HUGHES, D. J. This is not an action brought upon an ordinary contract by non-residents against a resident in a United States court on its law or equity side. It is a proceeding *in rem* in admiralty, brought in the United States district court as a court of admiralty. Such a proceeding will only lie upon a contract which is maritime. If the claims preferred in this proceeding be maritime, the court has jurisdiction. If they are not maritime, the proceeding is *coram non judice*, and will have to be dismissed. The owners, defendants, contend that the several claims represented by the respective libellants and petitioners here were for the original construction of the dredge Pacific; that such claims are not enforceable in admiralty; and that the court cannot entertain or enforce them in this proceeding, however meritorious in their nature, and however valid in equity and good conscience against the original owners of the dredge, Pardessus & Anthony, who procured the materials to be furnished and the work to be done which constitute the basis of these claims. The propositions of law relied upon by the owners or claimants are correct.

In *People's Ferry Co.* v. *Beers*, 20 How. 393, the United States supreme court, which gives us the admiralty law, decided, against the then generally prevalent opinion of the district judges, that a contract to build and complete a vessel is not within the admiralty jurisdiction of the United States courts, though the intention should be to employ the vessel in navigating the ocean; and that such materialman or builder, if he has a lien at all, has only the common-law possessory lien, or such statutory lien as local legislation may have created; neither of which, of itself, confers the admiralty jurisdiction. It held that this admiralty jurisdiction, in cases of contract, depends primarily upon the nature of the contract, and is limited to contracts, claims, and services purely maritime, touching rights and duties appertaining to commerce and navigation. It said·

"It would be a strange doctrine to hold a ship bound in a case where the owner made a contract in writing, charging himself to pay by instalments for building the vessel at a time when she was neither registered nor licensed as a sea-going ship."

It declared that the wages of shipwrights have no reference to a voyage to be performed. The court noticed the fact that district courts had recognized the lien of builders and furnishers of material

when the local law gave a lien upon the vessel where it was built; but it said that no such case had been sanctioned by the supreme court. Under this decision a contract, in order to be enforceable in admiralty at all, must be maritime. If it be not maritime no state law can help the jurisdiction of the court, and contracts for building and furnishing material to a vessel in the original construction of it are not maritime contracts.

In the case of *Roach* v. *Chapman*, 22 How. 129, where the steamer under libel was built in Louisville, Kentucky, and the persons who furnished the boilers and engines libelled in admiralty in Louisiana, the court held that there was no jurisdiction. It so held on the express ground that "a contract for building a ship or supplying engines, timber, or other materials for her construction is clearly not a maritime contract."

In that case it was insisted, for the libellants, that the local law of Kentucky, by giving a lien, supplied the defect of jurisdiction arising from the non-maritime character of the contract; but the supreme court replied that "local laws can never confer jurisdiction on the courts of the United States." In fact, it is well settled that local laws can neither enlarge nor diminish the admiralty jurisdiction, either by declaring those contracts to be maritime which are not, or those not maritime which are so by the admiralty law.

I think that the foregoing propositions settle all the claims in this case. They are all for materials, engines, machinery, work, or supplies furnished the original owners of the dredge in its original construction and equipment. As such, they come within the ruling of the supreme court in the case of *Roach* v. *Chapman*. The claims are not maritime, because they are for original construction and equipment. Not being maritime, the question of *home or foreign* vessel does not arise, and we have no need to examine the effect of the vessel law of New York. Not being maritime, the comprehensive law of Virginia, (chapter 235, p. 217, Acts of the Assembly, 1877–8,) giving liens and power of attachment against vessels foreign and domestic, can avail nothing in this court. In order to the existence of the admiralty jurisdiction in this court two things must concur—*First*, the claim must be maritime in its essential character; and, *second*, the lien must exist, either under the admiralty or the local law; a mere lien under a local law will not suffice of itself. I will sign a decree of dismissal as to the libel, and as to all the petitions in the nature of co-libels.