## THE DREDGE A.

### (District Court, E. D. North Carolina. October 5, 1914.)

### Nos. 44–53.

1 JUDGMENT (§ 717*)—RES JUDICATA—INTERLOCUTORY DECREE BY CONSENT.
    In a consolidated suit by a number of libelants and interveners to establish and enforce liens on a dredge, an interlocutory decree was entered by stipulation of all parties, including the owner of the dredge, finding that all the material allegations of the libels were true and that the libelants severally were entitled to recover the sums set out. It also ordered the dredge sold and the net proceeds paid into court to await its further orders, and decreed that, if insufficient to pay all of the claims in full, it should be distributed "pro rata in accordance with the sums and amount of claims of equal dignity herein adjudged to be due and payable." *Held*, that while, by such decree, the amounts and dates of the claims of the several libelants and interveners, and the considerations on which they were based, became res judicata as between the claimants named, the decree was not conclusive as to conclusions of law stated in the libels, and that the questions whether any claim constituted a maritime lien, and, if so, to what extent and of what dignity, were open for determination by the court.

    [Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1248; Dec. Dig. § 717.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2.** ADMIRALTY (§ 93*)—HEARING—REVIEW OF PRIOR INTERLOCUTORY ORDERS.

In admiralty, as in equity, on final hearing, all interlocutory orders relating to the merits are open to revision and under the control of the court.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 674–679; Dec. Dig. § 93.*]

**3.** MARITIME LIENS (§ 25*)—REPAIRS AND SUPPLIES—CONSTRUCTION OF STATUTE.

Act June 23, 1910, c. 373, § 1, 36 Stat. 604 (U. S. Comp. St. 1913, § 7783), giving a lien for repairs, supplies, or other necessaries furnished to a vessel òn order of the owner or a person authorized by him, does not create a new class of liens, and applies only to claims and contracts previously recognized as maritime and cognizable in admiralty.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 20, 31–36; Dec. Dig. § 25.*]

**4.** MARITIME LIENS (§ 25*)—CLAIMS ENTITLED TO LIEN—CONTRACTS FOR CONSTRUCTION AND EQUIPMENT OF DREDGE—"MARITIME CONTRACTS."

Respondent, having taken a government contract for dredging, bought an old hull and delivered the same to a contracting and constructing engineer to be used in the construction of a hydraulic dredge. *Held* that, until the dredge was completed and equipped for the use for which it was intended, it did not become a maritime entity within the admiralty jurisdiction, and that the contract for building the same, and contracts for materials, machinery, and equipment necessary for such completion were not "maritime contracts," and could not be the basis for liens on the vessel, under Act June 23, 1910.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 20, 31–36; Dec. Dig. § 25.*

For other definitions, see Words and Phrases, First and Second Series, Maritime Contract.]

**5.** MARITIME LIENS (§§ 10, 11, 12*)—CLAIMS ENTITLED TO LIEN—REPAIRS AND SUPPLIES FURNISHED TO DREDGE.

Creditors for repairs, supplies, pontoons, and other equipment furnished to a hydraulic dredge while engaged in work, which were necessary to her continued operation and furnished on the credit of the vessel, *held* entitled to maritime liens therefor.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 14, 15, 16; Dec. Dig. §§ 10, 11, 12.*]

**6.** MARITIME LIENS (§ 10*) — CLAIMS ENTITLED TO LIEN — EQUIPMENT FOR DREDGE.

While a hydraulic dredge was being built, libelant furnished on order of the owner rubber sleeves for use in connecting the pipes through which the material taken out by the dredge was carried and discharged. The sleeves were not unpacked nor used until the dredge had been completed and commenced work, and were necessary to its operation. *Held*, that they were a part of the original construction or equipment, without which the dredge was incomplete, and not repairs or supplies, and that libelant was not entitled to a maritime lien.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 14; Dec. Dig. § 10.*]

**7.** MARITIME LIENS (§ 38*)—REPAIRS AND SUPPLIES—CONSTRUCTION OF STATUTE.

Act June 23, 1910, c. 373, § 1, gives a lien for repairs or supplies furnished to a vessel on the order of her owner in her home port, which may be enforced by proceedings in rem, without proof that such repairs or supplies were furnished on the credit of the vessel, whereas previously such right only existed as to repairs or supplies furnished in a foreign port; but the lien so given is a "maritime lien," and the statute does not

affect or restrict the power of courts of admiralty to apply to such liens the principles applied to other maritime liens in determining rights of priority.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 71–77; Dec. Dig. § 38.*]

8. WORDS AND PHRASES—"RECONSTRUCT"—"CONVERT."
The words "reconstruct" and "convert" are not synonymous.

[Ed. Note.—For other definitions, see Words and Phrases, First Series, Convert; also, First and Second Series, Reconstruct.]

9. WORDS AND PHRASES—"CONSTRUCTION."
"Construction" is the process of bringing together and correlating a number of independent entities, so as to form a definite entity.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Construct.]

In Admiralty. Suit by Howard S. Roberts and others against the Dredge A and Edmund H. Mitchell, trading as Mitchell & Co., owner. On settlement of final decree.

See, also, 204 Fed. 262, 122 C. C. A. 527.

Small, MacLean & McMullan, of Washington, N. C., and Joseph R. Wilson, and Geo. C. Mahly, both of Philadelphia, Pa., for Roberts and others.

J. F. Duncan, of Beaufort, N. C., for Hancock and others.

C. R. Wheatley, of Beaufort, N. C., for Noe and others.

Guion & Guion, of New Bern, N. C., for Craven Supply Co. and others.

Rountree & Carr, of Wilmington, N. C., for National Hoisting Co. and others.

Hughes, Little & Seawell, of Norfolk, Va., and A. D. Ward, of New Bern, N. C., for Nottingham & Wrenn Co.

Abernethy & Davis, of Beaufort, N. C., for Acme Rubber Co.

Henry W. Bland, of New York City, and Chas. R. Thomas, of New Bern, N. C., for Shellenberg and others.

Willard M. Harris, of Philadelphia, Pa., for Bougher & Bishop and others.

Biddle, Paul & Jayne, of Philadelphia, Pa., Wicoff & Lanning, of Trenton, N. J., and Moore & Dunn, of New Bern, N. C., for Kensington Shipyard Co. and others.

Daniel G. Fowle, of Atlanta, Ga., for Mitchell.

CONNOR, District Judge. Steam Dredge A, which constitutes the subject-matter of this controversy, after being constructed at Philadelphia, Pa., in the manner and under the conditions found by the special master, as hereinafter set forth, was brought to Beaufort, N. C., where it was to be operated in dredging the navigable waters in and around the ports of Oriental, Morehead City, and Beaufort, N. C., upon a government contract which had been secured by the said Edmund H. Mitchell, trading as Mitchell & Co. After being operated several months in the performance of the work for which he had contracted, the said Edmund H. Mitchell, being unable to continue there-

in, forfeited his contract with the government and suspended work thereon.

On August 28, 1911, Howard S. Roberts libeled said dredge upon a claim the amount and consideration whereof are hereinafter set forth. During the month of September, and prior to October 24, 1911, certain other libelants, to wit, the Hyman Supply Company, the Craven Foundry Company, the York Foundry & Machine Company, the J. K. Petty & Company, the Earl Gear & Machine Company, the Nottingham & Wrenn Company, the Hancock Company, A. E. Pittman & Son, A. D. O'Briant, the Texas Company, S. P. Hancock, the J. W. Paxson Company, Alonso Thomas, the National Hoisting Machine Company, Alexander Miller & Bro., H. W. Noe and others, H. C. Jones, J. T. Beveridge, and the Tolson Manufacturing Company, filed libels against said dredge for amounts hereinafter set forth. On October 24, 1911, all of the libels and intervening libels were by order of the court consolidated, and on said day the attorneys of record prepared and submitted to the court a consent order or decree reciting:

"That the court finds that all of the material allegations of the libels are true, and that the libelants, hereinafter named, are entitled to recover herein the sums respectively hereinafter set out. It is further ordered, adjudged, and decreed that the steam Dredge A, her tackle, apparel, furniture, and appurtenances, be, and the same are, hereby condemned to the payment of the aforesaid amounts as hereinafter stated, and already found to be due, and for the further sum of the costs and disbursements in these actions, to be taxed by the clerk," etc.

Following a list of the amounts of the several claims, it is further adjudged:

"And that said dredge, her tackle, apparel, furniture, appliances, and appurtenances, be, and the same is, hereby condemned to the payment of the said sums above in full, if sufficient there be; otherwise, pro rata in accordance with the sums and amounts of claims, of equal dignity, herein adjudged to be due and payable."

It was further ordered that the marshal proceed to sell the said dredge, and upon confirmation of the sale—

"pay the proceeds arising from such sale, after deducting therefrom the cost and expense thereof, into the registry of this court, there to await the further orders of the court in the premises as to the distribution of the same."

The consent decree was signed by the proctors and advocates for each of the libelants, and of Edmund H. Mitchell. Subsequent to the date of the consent decree, and prior to the date of the sale of the dredge, pursuant thereto, the Acme Rubber & Manufacturing Company and Marvin Briggs filed libels for amounts based upon claims hereinafter set out. The said Dredge A was sold by the marshal, on November 22, 1911, for the sum of $20,000, and the sale duly confirmed. The amount of the purchase price was paid into court, and certain libels, based upon claims due for seamen's wages, being included in the claims named in the consent decree, and conceded by all parties to be entitled to priority, were paid off and discharged. The cost of caring for the dredge and of making sale were paid, and the balance held by the court for distribution.

Subsequent to the date of the sale of the dredge, George M. Jacocks, Bougher & Bishop, Frederick Craemer, Frank C. Somers, and the Kensington Shipyard Company filed libels based upon claims hereinafter fully set out. Other claims were made upon the fund, which have been eliminated by decrees made herein. On April 15, 1912, a decree was made directing that certain claims, therein set forth, be first paid in full, and the balance of the fund be distributed pro rata among the other libelants. From this decree the libelants, other than those declared to be entitled to priority, appealed, and, upon the hearing, the Circuit Court of Appeals reversed said decree for the reason set out in the opinion of Judge Smith. 204 Fed. 262, 122 C. C. A. 527.

Upon the filing of the mandate of the Circuit Court of Appeals, this court made an order of reference to George Green, Esq., special master, directing him to find the facts upon which each of said libelants' claims were founded, and report his conclusions of fact to the court. Counsel representing libelants Howard S. Roberts, the York Foundry & Machine Company, J. K. Petty & Co., and the Earl Gear & Machine Company insisted that, upon a correct interpretation of the opinion of the Circuit Court of Appeals, this court should make a final decree making a pro rata distribution of the proceeds of the sale of the dredge. They excepted to said order of reference. Conceiving that, in refusing to make such final decree, and in making the order of reference, this court erroneously misconceived the purport and meaning of the decision and mandate of the Circuit Court of Appeals, they moved the said court to issue a writ of mandamus directing the judge of this court to make such decree. Upon the hearing of said motion, on the return of the notice to show cause why said writ should not issue, the Circuit Court of Appeals denied the said motion.

The special master proceeded, after notice to all parties in interest, to hear the evidence and filed his report, in which he found the facts relating to the origin, construction, and operation of said Dredge A, and of the claims upon which the several libels are based. Upon the coming in of the report, several of the libelants filed exceptions, all of which, except as hereinafter stated, are overruled. Libelants who appealed from the decree of April 15, 1912, insisted that, upon the record, including the findings of the master, the court should make a pro rata distribution of the funds in its possession, being the net proceeds of the sale of the dredge, and from the refusal to do so excepted. Libelants whose claims are for supplies furnished subsequent to the time when the dredge arrived at Beaufort, N. C., insisted that they should be paid in full, postponing the claims of the other libelants.

The claims fall into two general classes—the dates of their origin and the consideration upon which they are based fixing the conditions upon which their rights must be determined: (1) Those originating while the dredge was under construction, between December 10, 1910, and May 11, 1911. (2) Those originating while said dredge was operating at Beaufort, N. C., subsequent to May 11, 1911.

[1] Counsel for libelants whose claims originated prior to May 11,

1911, insist that, by the terms of the consent decree, certain questions, both of fact and of law, have become res judicata, and are not now open to review, either to the other libelants or to the court. It is conceded that by the consent decree, under the facts set out in the libels, the amount and consideration of the claims are adjudged to be true. From this concession it is argued that it is not competent for the court to inquire whether they constitute maritime liens, or into their status in respect to priority in the distribution of the fund, conceded to be insufficient to pay all of the claims in full. It is elementary that facts once solemnly admitted of record, or adjudged to be true by a court of competent jurisdiction, are not open to further litigation between the same parties or their privies.

Passing, for the present, the question as to the conclusive effect of the facts found by the consent decree, upon those libelants coming into the record subsequent to its rendition, a distinction must be kept in mind between the *facts* agreed upon by the parties to the decree and entered upon the record by the court at their request, and the legal conclusions so adopted by the court, upon subsequent proceedings had in the case. It is conceded, upon conclusive reasons, sustained by abundant authority, that if, upon appeal, a judgment is reversed, and further proceedings directed to be had in the lower court, the decision of questions of law by the appellate court, presented upon the writ of error or appeal, constitutes "the law of the case," and must be so treated by the parties and the court of first instance. Any other rule of practice would result in confusion, uncertainty, and unseemly conflict. If, for instance, in this case the Circuit Court of Appeals has adjudged that claims of all of the libelants constitute maritime liens of equal dignity, and are therefore entitled to share pro rata in the distribution of the fund, it is not open to either of the libelants thereafter to litigate that question.

The consent decree was interlocutory, and for the manifest purpose of enabling the court to direct the sale of the dredge, thereby saving loss by reason of deterioration and charges for guarding, pending the litigation. Certain admissions of fact were made. Without discussing the question whether, upon a final decree, these admissions are conclusive upon the parties coming into the record subsequent to the date of the decree, it is sufficient to say that it is not proposed to bring into controversy, or litigate any facts admitted therein. In so far as the allegations contained in the several libels are conclusions of law, they, of course, are not binding upon the parties or the court. It does not follow that, at all stages of the cause, and for all purposes, conclusions of law, stated in the libels, should be conclusive upon themselves or the court. This is manifest from the language of that clause of the decree in which it is directed:

"That said dredge * * * be, and the same is, hereby condemned to the payment of said sums in full, if sufficient there be; otherwise, pro rata in accordance with the sums and amounts of claims, of equal dignity, herein adjudged to be due and payable."

It is further directed that the marshal pay into the registry of the court the proceeds of the sale of the dredge, "there to await the fur-

ther orders of the court in the premises as to the distribution of the amount." The consent decree fixed the amount, dates of the claims of the several libelants, and the consideration upon which they were based. No question is now raised in regard to either of these facts; they are res judicata. Whether, and, if so, to what extent, and of what dignity, as between the claimants named in the decree, all of said claims are maritime liens, are questions of law and must be decided upon the facts fixed by the consent decree, and such other relevant facts as are found by the master.

[2] A court of equity, upon a final hearing, has the power to review its conclusions made upon interlocutory hearings and incorporated into such decree. "By the modern practice, on a final hearing, all previous decretal orders are before the court, and may be modified, altered, or vacated, as justice may require. Thus, where the court made an interlocutory order stating that the complainants were entitled to recover certain claims and directing an account to be taken by the master, it was held that upon final hearing, at the argument of exceptions to the master's report, its previous order was fully open for revision and correction." 2 Beach, Modern Eq. Prac. § 635.

In Fourniquet v. Perkins, 16 How. 85, 14 L. Ed. 854, Taney, C. J., disposing of the objection to the existence of the power, said that it could not be maintained:

"The case was at final hearing of the argument upon the exceptions; and all of the previous interlocutory orders in relation to the merits were open for revision, and under the control of the court."

In Fairbanks Co. v. Windsor, 124 Fed. 200, 61 C. C. A. 233, Lacombe, Circuit Judge, said:

"At final hearing all of the previous interlocutory orders in relation to the merits were open to revision, and under the control of the court." 2 Street's Fed. Eq. Prac. 1918.

It would seem that the same rule should obtain in a court of admiralty. Of course, the court will not, except upon careful consideration and for cogent reasons, reverse or modify its interlocutory decrees. In this instance it is manifest that the court should not be estopped from making careful inquiry into the correctness and finality of the interlocutory decree signed at the request of all of the counsel for the purpose of bringing the property in controversy to sale, expressly reserving the question of the status of the claims in respect to their dignity.

We are thus brought to a consideration of the question whether the funds now in the custody of the court shall be divided pro rata, or whether any of the claims, and, if so, which, are entitled to priority. This involves two questions:

First. Are the debts contracted while the dredge was in the shipyard at Philadelphia, Pa., in course of construction, prior to May 11, 1911, maritime liens? If so, should they be paid pro rata with the claims contracted for repairs and supplies furnished to the dredge subsequent to May 11, 1911, after it reached Beaufort, N. C., and while engaged in the working of dredging? It is conceded that Dredge

A, after it was completed, was a vessel, and within the admiralty jurisdiction. McRae v. Dredging Co. (C. C.) 86 Fed. 344; Barnes v. Dredge Boat (D. C.) 169 Fed. 895; Am. Dredging Co. v. Pac. Mail S. S. Co., 185 Fed. 698, 107 C. C. A. 620; Cope v. Valette Dry Dock Co., 119 U. S. 625, 7 Sup. Ct. 336, 30 L. Ed. 501; Hughes, Adm. 12.

When did Dredge A come within the definition of a vessel and within the admiralty jurisdiction? In The Iosco, Fed. Cas. No. 7,060, it is said:

"Whether the claim of libelants arises out of a maritime contract, and whether they have a right of action in this court in rem, depends upon the question of fact whether what libelants did and furnished were to and for a vessel already in existence, or whether they were so done and furnished in part to bring her into existence as a complete thing. If the former, then the action will lie. If the latter, it will not lie, and this court has no jurisdiction."

The special master finds that:

"In December, 1910, Edmund H. Mitchell bought a certain old hull and carried the same to the Naffy & Seavy shipyard, Philadelphia, Pa., for the purpose of overhauling and reconstructing the same into a hydraulic suction dredge. The old hull, so purchased by Mitchell, had been built from timbers taken from an old government dry dock, and, at the time, contained a boiler, a condenser, and heater, and was not, at this time, a completed boat. Said Edmund H. Mitchell thereupon proceeded to install upon said hull a power plant and proper equipment, in order to reconstruct and convert the same into a suction dredge. In the process of this construction of the said dredge, the said Edmund H. Mitchell contracted with certain parties residing in Philadelphia and Jersey City for the furnishing of certain equipment, appliances and machinery needed for the completion of the said hull as a hydraulic 20-inch dredge. In consequence of the arrangement so made, the said hull was completed as a dredge on or about the 11th of May, 1911, and was then turned over to Edmund H. Mitchell by the contractor and constructing engineer, Howard S. Roberts, as a completed dredge, and thereupon the said Edmund H. Mitchell, trading as Mitchell & Co., proceeded to and had said dredge towed by way of Norfolk, Va., to Beaufort, N. C., where said dredge was to be engaged in the dredging of the navigable waters in and around the ports of Oriental, Morehead City, and Beaufort, N. C., upon a certain government contract, which had been secured by the said Edmund H. Mitchell, trading as Edmund H. Mitchell & Co., prior to the time of the purchase of the aforesaid old hull, which was constructed as aforesaid into the dredge, later named Dredge A."

In regard to the consideration upon which the claims of the several libels are founded, the master makes the following findings of fact:

### No. 1.—Howard S. Roberts.

"Libelant resided in the city of Philadelphia, Pa., during the year 1910. In November or December, 1910, libelant, at Philadelphia, in consequence of a phone conversation had with said Mitchell, who was then the owner of steam Dredge A, at New York, entered into a contract with said Mitchell to furnish to him, the said Mitchell, certain machinery and appliances to fit out a certain old hull, which said Mitchell then advised libelant that which it was desired to reconstruct and fit out as a suction dredge. That said contract, or agreement, so made, or so entered into, between libelant and Edmund H. Mitchell, provided that said libelant was to design and superintend the construction of said hull into a suction dredge. Said libelant was to procure to be furnished necessary machinery and equipment and superintend the installation of same and all necessary labor to do the installing. For his services in so designing, procuring material and labor, and constructing said dredge, libelant was to receive a commission of 10 per cent. on all such machinery and equipment furnished, and also a commission of 15 per cent. on

all labor used or performed in installing said machinery and reconstructing said hull into a dredge. Libelant did not, under said contract, agree to furnish said labor and material himself, but was to buy said machinery and equipment, have same billed to him, and then to rebill the same to the said Edmund H. Mitchell, at New York. The said labor, whether employed by said Roberts or Mitchell, was under the direction of the said Roberts, and upon the amount of labor so performed the commission to libelant was to be figured and charged. And in consequence of this contract, or agreement, the said machinery so bought for the said dredge was billed to libelant, and by him rebilled to the said Mitchell personally, or to Mitchell & Co., under which name said Edmund H. Mitchell was then doing business. That said machinery and equipment so furnished for constructing said dredge was rebilled to said Mitchell by said libelant at the exact face of the invoice at which it was originally billed to libelant, and upon said invoice libelant's commission of 10 per cent. was computed. That said machinery was so furnished to said Mitchell by libelant before the boat left the port of Philadelphia, Pa. That when libelant had completed his contract with said Mitchell [the said] hull was completely designed, constructed, and equipped as a hydraulic suction dredge; the said contract calling for the dredge boat as a unit. That the said machinery and material so furnished by libelant completely reconstructed and equipped said boat as a dredge of the type mentioned. That after all the items so furnished for the construction of the said dredge by libelant were billed and charged to Edmund H. Mitchell, or Mitchell & Co., by him, there was a certain amount of money, to wit, $924.16, to which said Mitchell was entitled to be credited by libelant to said Mitchell, leaving the balance due on said contract, as stated in the libel. $9,525.31. That libelant performed no service for the dredge after it left Philadelphia. That at the time said dredge left Philadelphia libelant's contract was fully performed, and the construction of said dredge was complete, except as hereinafter set out, in so far as said contract was concerned."

Upon the exception of libelant, the court makes the additional finding:

"After the dredge left Philadelphia, to wit, on May 12, 1911, libelant shipped to Beaufort, N. C., for the dredge, and on account of his contract, as hereinafter set out, a car load of discharge piping, amounting to $739.20, and on May 19, 1911, another car load of discharge piping, amounting to $739.20, and on May 22, 1911, a piece of special cast iron pipe, amounting to $62.20, all of which was placed on said dredge while she was at Beaufort."

### No. 2.—J. K. Petty & Co.

"This is a claim which covers certain items of construction, equipment, and labor procured from libelants between the dates of December 22, 1910, and April 28, 1911, amounting to $1,257.77. That said items were so furnished by libelants and used by Howard S. Roberts under a contract made with Edmund H. Mitchell, in the designing and construction for a certain suction dredge known as Dredge A. That said items were furnished while said boat was in the shipyard at Philadelphia, Pa., pursuant to an order given by Howard S. Roberts, in performance of the contract made by him with Edmund H. Mitchell, for designing of the old hull into the Dredge A. That said account for the items so furnished was charged to the said Roberts, and by him forwarded to Mitchell & Co., and all of the items were furnished upon the credit of said Howard S. Roberts, the said Edmund H. Mitchell not being, at that time, in a position to secure credit for the construction of the said dredge."

### No. 3.—J. W. Paxson & Co.

"Libelants, between the dates of April 5, 1911, and May 16, 1911, furnished certain items, composed of machinery and appliances (amounting to $645.46), to Howard S. Roberts, a constructing and designing engineer, or Edmund H. Mitchell, to be used, and which were used, in the construction of said dredge from an old hull at the time owned by the said Mitchell. That said items, as furnished, were billed either to said Roberts, constructing engineer, or to

217 F.—40

Edmund H. Mitchell, in consequence of instructions given to libelants at the time of the purchasing of said items. Said items were furnished on the credit of said Edmund H. Mitchell, or Howard S. Roberts, contracting and constructing engineer. That during all the time of the furnishing of said items the said boat, later named Dredge A, was in the port of Philadelphia, Pa."

### No. 4.—Earl Gear & Machine Company.

"This claim consists of certain items furnished between February 29, 1911, and May 5, 1911, amounting to $2,824.23, by libelant Howard S. Roberts, contracting and constructing engineer, in accordance with an agreement entered into between the said Edmund H. Mitchell and libelant. The material and labor was used and employed on said boat in reconstructing an old hull, into a suction dredge. The original amount was $3,824.23, on which the sum of $1,000 was paid in cash by Edmund H. Mitchell, and the promissory note of said Mitchell was given and accepted for the balance of the amount, $2,824.23. That the said items were furnished upon the credit of said Edmund H. Mitchell, and were used while the said boat was in the port of Philadelphia, Pa., in the process of construction as a steam dredge, the same as later known as Dredge A."

### No. 15.—National Hoisting & Engine Company.

"This is a claim for machinery furnished by libelant during the period from February 23, 1911 to May 21, 1911, aggregating the sum of $1,995.01, to Mitchell & Co. Items as in the libel set forth consist of machinery and machines constructed and built on the order and specifications of Howard S. Roberts, of Philadelphia, Pa. All this machinery and machines were furnished in order to complete and fit the vessel as a dredge, and the same was so furnished upon the credit of Mitchell & Co., and so charged to Mitchell & Co., without regard to the boat, and, with the exception of $305.30, which was paid in cash, the note of Edmund H. Mitchell was executed."

### No. 20.—Marvin Briggs.

"This is a claim for a balance due, in amount $700, on account of the purchase of a certain engine by Mitchell & Co. in March, 1911. This engine was delivered to Mitchell & Co. at the shipyard at Philadelphia while the dredge was in process of construction, and same there placed in the dredge as a part of its original equipment. Said Mitchell & Co. bought said engine at the price of $2,100, and paid thereon $1,400, leaving a balance of $700. Said engine was placed in the hull at Philadelphia, which was then and there being constructed into a hydraulic dredge."

### No. 21.—George M. Jacocks.

"This is a claim by libelant for cash furnished to Edmund H. Mitchell between the dates December 23, 1910, and March 29, 1911, in the amount of $3,719, as shown in the libel. This claim was filed after the sale of the dredge under process November 22, 1911. No evidence has been offered or introduced in support of the allegations of the libel from which to find the facts with regard to this claim."

The findings above set forth, to which no exceptions have been filed, would seem to dispose of this claim. It is clearly not a maritime lien.

### No. 22.—Bougher & Bishop.

"This is a claim for provisions and supplies furnished by libelants between February 28, 1911 and May 11, 1911, while the dredge was in the port of Philadelphia in the process of construction. The total amount of the claim was $612.34, on which $403.17 is credited as paid, leaving balance due of $209.17, as claimed in the libel filed. The said provisions and groceries were furnished by libelants while the dredge was under construction at Philadelphia, and before the same was completed."

The libel was filed after the dredge was sold under process of the court. There is a total absence of any finding that the provisions and supplies were furnished for the use of, or were used by any persons working upon, or having any connection with, the dredge.

### No. 23.—Frederick H. Craemer.

"This is a claim for supplies, wharfage, lighterage, and labor furnished, and interest on money loaned, to Mitchell & Co., by libelant, between January 27, 1911, and May 12, 1911. At said time said dredge was in the port of Philadelphia and was in process of construction, being then fitted out from an old hull into a hydraulic dredge. The libel was filed December 28, 1911, after the dredge was sold under process of the court."

There is no finding separating the claim for "wharfage and lighterage" from supplies, labor, and interest on money loaned, nor is there any finding that either of the last-named items had any relation to the dredge. It would seem that, under no aspect of the case, is this claim a maritime contract.

### No. 24.—Frank C. Somers.

"This is a claim for supplies and provisions furnished by libelant to Mitchell & Co., or Edmund H. Mitchell, between the dates March 25, 1911, and May 11, 1911, amounting to a balance of $471.78, as stated in libel. The items so furnished were furnished while the dredge was in process of construction in the shipyard at Philadelphia, and before same was completed as a dredge. This claim was filed December 30, 1911, after the dredge was sold under the process of the court."

There is no finding that the supplies and provisions had any relation to the dredge, nor any other fact found bringing them within the definition of a maritime contract.

### No. 25.—Kensington Shipyard Company.

"This is a claim for work and labor done, and materials supplied, in the construction of Dredge A, at the shipyard in Philadelphia, on May 9, 1911, amounting to $426.79. The said material and work were furnished and performed while said dredge was in the port of Philadelphia, under construction and prior to its completion as a dredge. The libel was filed February 10, 1912, subsequent to the sale of the dredge under the process of the court."

The exceptions filed to the finding of the master in respect to this libel are overruled.

### No. 26.—Gordon Miller & Bro.

"This is a claim for machinery furnished by libelants between the dates of April 11, 1911, and May 11, 1911, aggregating a balance of $1,264, to Mitchell & Co., and was a necessary part of the equipment of the vessel in order to prepare this dredge for the work it was intended to do, installed while the vessel was in port at Philadelphia, in the process of construction, and was included in the contract of construction between Mitchell and Howard S. Roberts, and that the same was furnished in consequence of a bid by libelants which was accepted by Mitchell & Co., and same charged to the account of Mitchell & Co. Same was a part of the construction of Dredge A, and was furnished in conformity with direction of constructing engineer in charge of the building of the said boat."

### No. 27.—York Foundry & Machine Company.

"This is a claim which covers certain items of equipment procured by Howard S. Roberts for Mitchell & Co. from libelants, between the dates of February 12, 1911, and May 20, 1911, amounting to $437.07. That said items were

furnished pursuant to said Roberts' contract to equip the boat and construct same as a hydraulic dredge. The material was furnished partly in Philadelphia and part shipped to boat to Norfolk, or Beaufort, as the same was too late to reach the dredge at Philadelphia. That said Roberts, in the furnishing of said items, was acting under his contract with Mitchell as a constructing and contracting engineer and gave the orders for the items furnished. That said account for said items furnished was charged to Mitchell. All items were made in York, Pa., and shipped by rail. The iron bar cap head and spud points were used as a part of the original equipment and construction of the dredge. The pattern is a mold used in molding the ladder head."

[3] All the foregoing claims are for supplies and materials furnished upon the order of the owner, or Howard S. Roberts, while the dredge was in course of construction in her port of origin. It is conceded that, unless within the provisions of Act June 23, 1910, c. 373, 36 Stat. 604, Fed. Stat. Anno. (Supplement 1912) 352, none of them are maritime contracts, constituting maritime liens. This act makes a radical change in the law, and, by reason of the short period elapsing since its enactment, has been considered by courts in but few cases. It provides that:

"Any person furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

In New York Trust Co. v. Bermuda-Atlantic Steamship Co. (D. C.) 211 Fed. 989, at page 996, the special master discusses the statute and the changes made in the existing law. He points out the evils which it was intended to remedy. In so far as the provisions of the statute are applicable to the libels filed herein, it is necessary to note that the maritime lien is given for "repairs, supplies and other necessaries" furnished in the home port, upon the order of the owner. The question, therefore, which must be settled, primarily, is whether, upon the facts stated in the consent decree and found by the master, the articles furnished and labor performed are within the terms of the statute; whether they are maritime contracts. In The J. Doherty (D. C.) 207 Fed. 997, it is held that the words "repairs, supplies and all other necessaries" do not include towage; that the words "other necessaries," as used in the statute, are limited, and are of the general nature of repairs and supplies as are fit and proper for the use of a ship. In The Sinaloa (D. C.) 209 Fed. 287, Dooling, District Judge, says:

"The purpose [of the statute] does not seem to have been to create a new class of liens, or liens for services which had been theretofore determined not to be maritime, but only to deal with certain matters that had always been recognized as cognizable in admiralty."

This is in accordance with well-settled canons of statutory construction by which courts are guided in ascertaining the intention of the Legislature. "The presumption is that the Legislature does not intend to change or modify the law beyond what it declares, in express terms, or by unmistakable implication." 26 Am. & Eng. Enc.

649. Mr. Justice Strong in Shaw v. Railroad Company, 101 U. S. 557, 25 L. Ed. 892, says:

"No statute is to be construed as altering the common law further than its words import. It is not to be construed as making an innovation upon the common law which it does not fairly express."

This canon of statutory construction, and the extent to which it has been applied and enforced, is illustrated in the reports of numerous cases in both state and federal courts. It may be assumed, therefore, that before libelants can invoke the provisions of the statute they will be required to show, not only the amount and consideration of their claim, but that they are within the admiralty jurisdiction, as limited by the decisions of the courts prior to the passage of the statute—that they are maritime contracts, as defined by courts of admiralty. The policy of the law, for well-known and salutary reasons, has been to discourage and reject secret liens upon property. The exception made by the courts of admiralty, giving such liens for repairs and supplies furnished to a vessel while in a foreign port, is based upon well-understood reasons, and should be carefully restricted.

[4] If, therefore, the libelants' claims are not for "repairs, supplies or other necessaries," they are not maritime contracts. In People's Ferryboat Co. v. Beers, 20 How. 393, 15 L. Ed. 951, it is said:

"The admiralty jurisdiction, in cases of contract, depends primarily upon the nature of the contract, and is limited to contracts, claims, and services purely maritime, and touching rights and duties appertaining to commerce and navigation."

See The Lottawanna, 21 Wall. 558, 22 L. Ed. 654.
So it is said:

"Although maritime liens tend to build up commerce as furnishing a basis of credit, they are secret liens on movable property, following into the hands of innocent holders. Hence the law inclines against them, and any one asserting such a lien must satisfy the court of his right to it." 26 Cyc. 751.

An examination of some of the decisions, in which the distinction between construction and repairs is drawn, aids in ascertaining into which class the claims of libelants, originating in Philadelphia, prior to May 11, 1911, should be placed. In People's Ferry Co. v. Beers, supra, the contract for constructing the "hull" was in writing, payable in installments. Mr. Justice Catron says:

"It would be a strange doctrine to hold a ship bound in a case where the owner made the contract in writing, charging himself to pay by installments for building the vessel at a time when she was neither registered nor licensed as a sea-going ship."

In Roach v. Chapman, 22 How. 129, 16 L. Ed. 294, the boat was built at Louisville, Ky., and the libelants furnished the boilers and engine. Payments were made as the work progressed, and bills of exchange were taken for the balance due after the vessel was completed. Mr. Justice Grier says:

"A contract for building a ship, or supplying engines, timber, or other materials for her construction, is clearly not a maritime contract."

It was held that the claim was not within the jurisdiction of the admiralty. Mr. Hughes (26 Cyc. 763) says:

"The decisions agree that everything done before the vessel is launched comes under the head of construction. But there is much conflict on the question whether work done and material furnished after the vessel has been launched, but before final completion, should be classed as construction work. Some cases hold that the structure becomes a ship as soon as she rides upon her destined element; others, that anything forming a part of the ship or her tackle or apparel is, when first furnished, part of her construction. The better opinion is in favor of the latter view."

In The Winnebago, 205 U. S. 354, 27 Sup. Ct. 509, 51 L. Ed. 836, Mr. Justice Day says:

"It is next objected that the court erred because certain items were allowed [by the state court under a state statute] for material furnished the vessel *after she was launched*, and therefore the subject of exclusive jurisdiction. * * * But we agree with the state court that these items were really furnished *for the completion* of the vessel and were fairly a part of her original construction. In such a case the remedy was within the jurisdiction of the state court."

See, also, The Winnebago, 141 Fed. 945, 73 C. C. A. 295.

The master finds that Edmund H. Mitchell, having entered into a contract with the government which required dredging in the navigable waters in and around Beaufort, N. C., purchased "a certain old hull * * * which had been built of timbers taken from an old government dry dock, and at this time contained a boiler, condenser, and heater, and was not, at this time, a completed boat." It would be to strain the meaning of words to call the thing, or object, thus described, a "ship" or "vessel." It has been held that "a hull is not a ship." Northup v. The Pilot, 6 Or. 297; Srodes v. The Collier, Fed. Cas. No. 13,272. It is manifest that the entity, or thing, which Mitchell purposed bringing into existence, was entirely distinct from the hull which constituted the original element in the new structure. The "dry dock," from the timbers of which the hull was constructed, was not a ship. The Warfield (D. C.) 120 Fed. 847; 26 Cyc. ——, note. In The Paradox (D. C.) 61 Fed. 860, Brown, District Judge (S. D. N. Y.), said:

"After the hull, constructed by other persons, was sufficiently advanced, it was launched, towed to the libelant's yard, and the machinery there put in by the libelant company, and by the preceding company, with changes of detail from time to time in the course of construction, so as to make the machinery as efficient as possible. * * * When the vessel is completed for the purpose intended, then the vessel is 'built' and not till then; whether it be a steamer, a sailing vessel, a barge, a scow, or a mere float designed to support and transport a bath house; * * * and whatever is supplied to such a vessel for the purpose of making it what it was intended to be, and to enable it to enter upon the kind of business of navigation intended, is a part of the 'building' of the vessel. This is the clear weight of authority."

It makes no difference that the vessel was in the water. It is always the case that a portion of the construction of a vessel is after she has been put in the water. It clearly appears that the vessel was not so far completed at the time as to enable her to discharge the functions for which she was intended.

In McMaster v. One Dredge (D. C.) 95 Fed. 832, it appears that, at the time the contract was made, the Sneed Company (owner) had a scow, and that the purpose of the contract was to convert the scow into a dredge. The scow had never been used as a dredge but was merely a wood scow or barge. The judge, after citing a number of cases, said:

"Tried by this criterion, the work and labor and materials furnished in this case were for the building of the vessel. It can make no difference whether the scow was already built, and had theretofore been used for another purpose, or whether it was newly constructed for the purposes of a dredge. The purpose of this contract was to build this scow into a dredge. As a mere wood barge, the things done were not required. It was only for the purposes of a dredge, which, in its relation with the scow, was a new thing, that the work and labor in this case were performed, and the materials furnished; and this is a building of the dredge, within the rule adopted in the cases cited. What was done and supplied in this case was for the purpose of making the vessel what it was intended to be, and what it had theretofore not been, a dredge, a thing with which the wood scow, as such, had no relation. This contract, therefore, was not a maritime contract. It was a contract to convert the wood scow into a dredge, which is precisely the same as one to build a dredge."

If we substitute the word "hull," as described by the master, for "scow," the language describing the condition existing, in regard to Dredge A, at Philadelphia, prior to May 11, 1911, the result must be the same as arrived at by the court. The Rapid Transit (D. C.) 11 Fed. 322. It was then, and not till then, that the dredge became a maritime entity, and within the admiralty jurisdiction; it was then that she became a completed dredge and subject to be repaired and supplied to enable her to perform the work for which she was constructed.

[8, 9] It does not appear, from the master's finding, for what purpose the "old hull" was constructed, or that, at any time, was a part of, or used in connection with, a dredge. He says that Mitchell "proceeded to install upon said dredge a power plant and proper equipment in order to reconstruct and convert the same into a suction dredge." There lurks in the use of the words "reconstruct" and "convert" a confusion, and consequent obscurity of thought. They are not synonymous. They convey different mental conceptions. This is shown by the next succeeding sentence in the report. "In the process of this construction of the said dredge," etc. It is doubtful whether, by close adherence to the several shades of thought, expressed by the language used, a very satisfactory conclusion would be reached. Coming to a practical view of the situation, described by the master, we find that Mitchell was in need of a "suction dredge" for the purpose of dredging. He gathered certain elements, which, when brought together, assembled, co-ordinated, resulted in, or brought into existence the entity, the thing, which he desired. The "old hull" was the first element obtained, and upon this he placed certain machinery and appliances, which, being brought into orderly relation, constituted the dredge. The process, described by the master, is not "reconstructing" or repairing an existing entity, but, by bringing together—correlating—a number of independent entities, constructing a definite

entity; and this process is construction. The Count De Lesseps (D. C.) 17 Fed. 460.

These claims come clearly within the letter and spirit of the language of Justice Clifford in Edwards v. Elliott, 21 Wall. 532, 22 L. Ed. 487, in which, after a discussion of the earlier cases, he says:

"Convinced or not, every candid inquirer must admit that this court did decide in that case [People's Ferryboat v. Beers, 20 How. 393 (15 L. Ed. 961)] that neither a contract to build a ship, nor to furnish materials for the purpose, is a maritime contract."

The master finds, in regard to many of these claims, that in furnishing the articles and the cash the libelants extended credit to the owner and not to the dredge; as to one or more, the owner's note was accepted, the price was payable by contract in installments. The circumstances under which the materials and cash were furnished, and the labor performed, strongly tend to show that credit was extended to the owner. The statute had been in force only a few months, and it must have been well known to libelants that materials and supplies for construction were not maritime contracts, and therefore not maritime liens. It is true that the statute removes the presumption that materials and supplies furnished in the home port, upon the order of the owner, are furnished upon his credit, and not that of the boat. In Ely v. Murray & Co., 200 Fed. 368, 118 C. C. A. 520, Judge Putnam, writing for the Circuit Court of Appeals, referring to the words of the statute in that respect, says:

"Of course, this does not bar proof that whatever was furnished was furnished on the mere credit of the owner, and in no sense on the credit of the vessel; but it meets the presumption that there is no lien for materials furnished on the order of the owner, as there is a presumption in favor of a lien when the articles are ordered by the master under appropriate circumstances."

Judge Toulmin (D. C. S. D. Ala.), in The Lucille, 208 Fed. 424, citing the language of Judge Putnam, says:

"An agreement or understanding as to whom credit was given may be inferred from acts and circumstances, as well as from express language, as is ordinarily true with reference to all alleged contracts where it must be shown that the minds of the parties met."

In respect to the claims of the other libelants, the master finds:

"That after the arrival of said dredge into the port of Beaufort, N. C., where its operations were to be begun, the said dredge was, at the time, in a leaky condition, and the owner, Edmund H. Mitchell was at that time without funds wherewith to provide the necessaries for labor and materials for its preservation. The said dredge stood in need of certain repairs, supplies, and working facilities in order to enable it to carry on its operations of dredging on the contract in which it was engaged in the waters of the harbor of Beaufort and Newbern; the said dredge was preserved and enabled to continue its dredging operations, and to carry on the work of dredging in the said waters about the harbor of Beaufort, until the sale of said dredge by the marshal under the process in these proceedings. The said dredge was so sold under a ven. ex. at the courthouse door in Beaufort, N. C., on the 22d day of November, 1911. The supplies advanced and repairs and equipments furnished said dredge, after its arrival at the port of Beaufort, N. C., were absolutely necessary and essential to enable the said dredge to continue and carry to completion the operation of dredging which had been undertaken under the contract of Edmund H. Mitchell, aforesaid, in the navigable waters in the harbor, or port, of Beaufort, N. C."

In respect to these claims the master makes the following findings of fact:

### Nos. 5 and 18.

"These are the claims of H. W. Noe and others and of A. D. O'Bryan for seamen's wages. They have been, by consent of all parties, paid in full, having priority."

### No. 6.—Hancock & Co.

"This is a claim for certain supplies furnished by libelants between the dates May 23, 1911 and September 11, 1911, amounting to $2,198.86, to steam Dredge A, at the port of Beaufort, N. C. Said supplies consist of provisions and groceries for the maintenance of the crew engaged on said dredge during its dredging operations, while in the port of Beaufort, and consist of necessaries for said crew and seamen. That said supplies so furnished were furnished upon the sole credit of Dredge A, pursuant to an agreement made with Edmund H. Mitchell, owner of Dredge A, and S. P. Hancock, in behalf of the firm of Hancock & Co.; said contract so made between the owner of said dredge and libelants being based upon the assurance of said owner that there was no claim against said boat, and that the boat was his own property, and the supplies so furnished were delivered to the said dredge upon the order of said Edmund H. Mitchell, or A. D. O'Bryan, superintendent in charge of the dredge, while same was operating at Beaufort, N. C."

### No. 7.—Alonzo Thomas.

"This is a claim consisting of items for supplies furnished between May 30, 1911, and September 5, 1911, in the amount of $88.73, by libelant to steam Dredge A. Items composing said account were furnished by libelant upon the sole credit of steam Dredge A, and the same consist of groceries and provisions and sundry necessaries for said dredge and its crew while the same was engaged in its dredging operations in the port of Beaufort, N. C."

### No. 8.—H. C. Jones.

"This is a claim for materials and supplies, in amount $315.20, furnished by libelant to Dredge A, between January 5, 1911, and September 11, 1911, at the port of Beaufort, N. C. Said supplies and materials consist of ropes and other sundry supplies for said dredge necessary in the performance of its work at Beaufort, same being in amount $265.20. The further item of $50 is for towing said dredge from its docking place at Beaufort to the point in Beaufort harbor where it began its work of dredging. Said supplies and services were necessary in order to enable said boat to continue its dredging operations."

### No. 9.—J. T. Beveridge.

"This is a claim for the hire of barges and transports and other necessaries from Beaufort to Dredge A between July 1, 1911, and September 21, 1911, amounting to $386.50, as set forth in the libel. Said barges were necessary, as a means of transporting coal and other necessary articles from Beaufort to the dredge, in order to enable it to continue to perform the dredging."

### No. 10.—Hyman Supply Company.

"This is a claim for materials and supplies in the amount of $1,277.43, furnished to steam Dredge A in the port of Beaufort, N. C., between May 22, 1911, and September 23, 1911. These materials and supplies consisted of various parts and fittings to replace and repair and supplement parts of like nature and kind, which had become worn and unable to perform their functions, integrals of the said dredge, and were necessary for the operation of the said dredge and the continuation of its work under the contract with the United States government. These materials were furnished upon the sole and express credit of Dredge A, and were received on the dredge by the owner, Edmund H. Mitchell, or A. D. O'Bryan, superintendent in charge, while the dredge was engaged in its work or about the port of Beaufort, and but for which it could not pursue its work or operations of the class or nature."

### No. 11.—Claim of Craven Foundry & Machine Company.

"This claim is for labor of men on board the dredge, while at the port of Beaufort, and various parts and castings and fittings for the repairs to said dredge and machinery, between the dates of May 25, 1911, and August 31, 1911. The work and materials were furnished at request of the owner, at times when the same was imperative and necessary, either because of breakdowns in the machinery or parts, or of such calamities as required expert mechanical attention, in order to permit the said dredge to continue its functions. This was furnished upon the sole and exclusive credit of the dredge, and is for the amount of $973.03."

### No. 12.—Tolson Lumber & Manufacturing Company.

"This is a claim for lumber furnished steam Dredge A between June 7, 1911, and July 19, 1911, amounting to $196.19, and said lumber was used on said dredge in rebuilding and repairing the framing, deckwork, and cabins, which had been damaged- and partly destroyed by accident during the operation of said dredge, and which it was necessary to repair in order to continue work. The said timber was furnished on the sole credit of said dredge."

### No. 13.—S. P. Hancock.

"This is a claim for supplies and cash furnished for the payment of supplies for the protection and preservation of Dredge A, while engaged in dredging at the port of Beaufort, N. C., said items being so furnished between May 22, 1911, and July 3, 1911, and aggregating amount of $5,511.40. The amounts in cash furnished cover payments for pontoons used in connection with the dredge in its dredging operations, for the purchase of coal, and for seamen's wages in manning and running boat for immediate necessary supplies and repairs procured for said dredge during its dredging operations. The items so furnished were furnished by libelant upon the sole credit and security of said dredge, the same having been furnished by libelant in consequence of representations made to him by the owner, Edmund H. Mitchell, that the dredge was clear of any claim against it, and that the amounts furnished each month would be a first lien upon the earnings of said boat during said month and same to be paid out of such moneys. The said amounts and items so advanced were necessary and essential to enable the boat to begin and continue the operation of its dredging in the harbor of Beaufort, for which purpose it was, at the time, stationed at Beaufort. At the time of the original furnishing of said amounts, the said dredge was in a condition wherein it was necessary to have and maintain a sufficient crew of men to operate the machinery on said boat, in order to keep the said boat from accumulating bilge water and to protect and preserve the same, that it might continue the contract of dredging which it was undertaking consequent to the contract between libelant, under the representation made to him by said owner that it was necessary to have additional furnishings in order to preserve the property, to make necessary repairs for its recurring breakdowns, and to keep said dredge in operation, furnished upon the credit of said dredge and its earnings, between the dates set forth, as to items composing this claim. Without the item so furnished by libelant Mitchell could not have continued its operations. He would have been subject to loss by reason of the leaky condition of the dredge, since he was not, at that time, in a position to secure such advances as were necessary to preserve the boat otherwise than by specially pledging it and its earnings for payment for said advances."

### No. 14.—The Texas Company.

"This is a claim for lubricants and oils, furnished by libelant to Dredge A during the period from May 11, 1911, to September 12, 1911, in amount $234.59. Said lubricants and oils were necessary for the operation of the said dredge and for the protection and preservation of its machines, machinery, and equipment. Said supplies were furnished and delivered to Dredge A upon the credit of said dredge, upon the order of Edmund H. Mitchell, owner, and A. D. O'Bryan, superintendent, of said dredge."

### No. 16.—Nottingham & Wrenn Company.

"This is a claim for coal furnished to Dredge A by libelant between June 20, 1911, and September 6, 1911, amounting to $418.66. The said coal was a necessary supply for said dredge in order to enable it to operate the machinery and maintain said dredge in a safe and working condition. The same was furnished and delivered to said Dredge A by order of Edmund H. Mitchell, owner, and A. D. O'Bryan, superintendent."

### No. 17.—A. E. Pittman & Son.

"This is a claim for two-horse gas engine and appurtenances furnished by libelants to Dredge A on June 17, 1911. Said engine was used for the purpose of pumping water which was used upon said dredge in running its boiler, and was also used in pumping the said dredge free from bilge water. The same was so furnished while said Dredge A was at Beaufort engaged in dredging and was a necessary appurtenant thereto."

[5] The foregoing claims are clearly for necessaries, being for materials, supplies, and repairs. They were furnished after the dredge was complete, and while actually engaged in the work for which it was constructed. They were furnished upon the credit of the dredge. They come clearly within the class of contracts upon which a maritime lien accrues, as defined by Mr. Hughes. He says:

"Necessaries, in this connection, mean whatever is fit and proper for the service on which a vessel is engaged. Whatever the owner of that vessel, as a prudent man, would have ordered if present at the time, comes within the meaning of the term as applied to those repairs done, or things provided for the ship by order of the Master." Adm. 96; The Grapeshot, 9 Wall. 129.

[6] One other claim remains to be disposed of:

### No. 19.—Acme Rubber & Manufacturing Company.

"This is a claim for certain rubber sleeves furnished by libelant to Mitchell & Co. for Dredge A at the shipyard in Philadelphia, between December 20, 1911, and March 23, 1911, amounting to $1,336.50. Said rubber sleeves were shipped to Mitchell & Co. by libelant, and were kept for use in connecting pipes through which the dredge discharged material from the channel as the same might become necessary in its operation. Said sleeves were so furnished to Mitchell & Co. while the dredge was at Philadelphia, and while the same was in process of construction; said sleeves being so furnished as a part of construction of said dredge. The necessity of said sleeves was determined by the distance from the dredge to where the mud was inspected. The rubber sleeves were not used on the dredge until she began the work of dredging at Beaufort, N. C. They were not taken out of the original package until the work was begun. They were used to connect the pipes which discharged the mud and material, and were used from time to time until the dredge stopped work. They were necessary for the work at Beaufort, and were purchased to be used in said work."

This claim seems to be along the border line. While the master finds that it was a part of the construction of the dredge, and was purchased while it was being constructed at the shipyard at Philadelphia, it appears that the sleeves were not used, nor the package opened, until the dredge reached Beaufort, and begun the work of dredging. It is manifest, however, that, until supplied with the "sleeves," as found by the master, the dredge was not completed. It was not a suction dredge. They come within the principle announced in The Win-

nebago, supra. They were "furnished for the completion" of the dredge. The contract was made while in course of construction, and the master finds "as a part of the construction."

Careful consideration, in the light of the principles of maritime law, as announced and enforced by the authorities cited, leads me to the conclusion that the claims originating prior to May 11, 1911, and while the dredge was in the shipyard at Philadelphia, are for construction, and not repairs; that the cash and articles furnished between those dates were furnished for construction, and not maritime liens. I am also of the opinion that they were furnished upon the credit of Edmund H. Mitchell. The claim for the articles, cash, and materials furnished and labor performed for the dredge after May 11, 1911, and while she was engaged in the work of dredging in Beaufort harbor, are for repairs and necessary supplies, clearly within the admiralty jurisdiction, and constitute maritime liens on the dredge.

[7] Another view of the facts found in this record has been advanced which is entitled to careful consideration. Conceding, pro hac vice, that by the statute of June 23, 1910, the claims originating, as found by the master, while the dredge was in the shipyard at Philadelphia, prior to May 11, 1911, are made maritime liens, the questions arise whether, as between them and the claims for materials and supplies furnished, as found by the master, while the dredge was in the port of Beaufort, engaged in the work for which she was designed and constructed, they should be paid pro rata. In the opinion of Judge Smith, in Steam Dredge A, 204 Fed. 262, 122 C. C. A. 527 it is said:

"The general rule, as to maritime liens of this class, is that, in the absence of special reasons existing for preferring one over the others, they will be placed upon the same basis as to rank and priority, where the supplies and repairs have been furnished and performed for the same voyage, or purpose, or substantially during the same period, or, as it may be otherwise stated, as a rule maritime liens for supplies and repairs furnished and performed in the same season and within a period of reasonable time are placed upon the same footing. Where they are separated by distinct voyages, or by an appreciable length of time, it has been held that those furnished and performed last are entitled to priority of payment, and the courts of maritime jurisdiction have also held generally that under special circumstances attending a claim of this character, such as supplies or repairs furnished or performed under circumstances that saved the vessel from threatened loss or destruction, such a claim, although last in order of time, may yet be decreed priority in payment."

The error found in the decree appealed from was that the record did not disclose "such special circumstances." Unless, therefore, the findings of the master discover "such special circumstances," assuming that the claims for labor and materials performed and furnished at Philadelphia are maritime liens, the decree now rendered should direct the application of the proceeds of the sale of the dredge to all of the claims pro rata.

In The Jerusalem, Fed. Cas. No. 7,294, Mr. Justice Story says:

"A tradesman has a lien on a foreign ship, lying in a port of the United States, for repairs made by him on board, and such a lien will be preferred, in point of right, to a bottomry interest, which is prior in point of time, if it appear that the repairs were indispensable."

Judge Hughes (E. D. Va.) in The Omer, Fed. Cas. No. 10,510, says:

"Among materialmen, the one contributing 'most immediately'—that is to say, at the latest stage of the voyage—to enable the vessel to complete it, has preference over those who contributed at an earlier stage of the voyage."

Hughes, Adm. 332 (176), stating the ground upon which a priority among maritime contract claims is based, says that such right of priority is recognized, "as there is supposed to be an inherent merit in certain ones over others, in the absence of special equities, arising from the comparative dates of their service, and other considerations." In the absence of authoritative decisions, or enlightening judicial expressions, as to the extent to which the maritime lien given by the act of 1910, for claims attaching to vessels for supplies and materials furnished in their home ports, shall be enforced, when conflicting with claims of a similar character originating in foreign ports, resort must be had to analogies and suggestions based upon principles of justice and equity. Prior to the enactment of the act of 1910, the question presented in this case could not have arisen. Such claims were dependent upon state statutes, enforceable in state courts. If, as insisted by counsel, the statute fixes upon a vessel for contracts for construction, as found by the master, in its home port, a maritime lien of equal rank and merit as claims for supplies and repairs furnished or performed in a foreign part, it would seem that the basis or policy upon which a maritime lien is given for supplies or materials, is impaired. If a vessel goes out from her port of origin, incumbered with maritime liens, based upon contracts for materials and supplies and construction, furnished upon the order of her owner, or his representative, of equal rank and dignity as the lien given for repairs and supplies furnished in a foreign port to enable her to perform the mission for which she is designed, her ability to obtain such supplies or secure such repairs as are necessary will be very seriously curtailed. While for such repairs and supplies as come within the scope of the statute a maritime lien is given which may be enforced in rem, the power exercised by the courts of admiralty to apply to them the principles applied as between other maritime liens is not affected or restricted. The statute does not create a new or different character of lien or right from that which existed in favor of those who furnished materials for repairs or supplies to a vessel in a foreign port, but extends such lien to the same class of claims furnished in her home port. The Sinaloa, supra. The statute gives "a maritime lien" in such cases, not a statutory lien. It is a recognized rule of construction that when words are found in a statute, which have a well-defined, legal definition, or meaning, it will be presumed that the Legislature intended them to be construed in the light of such meaning; therefore, when a "maritime lien" is given for supplies and repairs furnished to a vessel in her home port, the term must be given the definition and meaning attaching to it in the administration of maritime law. If, therefore, such special circumstances are found, in regard to the claims of libelants, furnishing repairs and materials while the dredge was in Beaufort, they would bring such claims within the exception to the general rule.

The question, therefore, arises whether the findings of the master disclose such circumstances. It is not practicable to discuss, in detail, the peculiar circumstances under which each of these claims originated. The master finds that:

"After the arrival of said dredge into the port of Beaufort, N. C., where the operations were to be begun, the said dredge was at that time in a leaky condition, and the owner, Edmund H. Mitchell, was at that time without funds wherewith to provide the necessaries in labor and materials for its preservation. The said dredge stood then in need of certain repairs, supplies, and working facilities to enable it to carry on its operation of dredging in the waters of the harbor of Beaufort, and, by reason of the supplies so furnished by libelants at Beaufort and Newbern, the said dredge was preserved and enabled to continue its dredging operations."

He further finds that the supplies, advances, and repairs "were absolutely necessary and essential in order to enable the said dredge to continue to carry on to completion the operation of dredging," etc. An examination of the testimony as to the articles furnished and labor performed, as set out in the libels of Hyman Supply Company, Craven Foundry Company, Tolson Lumber Company for repairs, etc., of Hancock & Co., Alonzo Thomas, H. C. Jones, and S. P. Hancock for supplies, of the Texas Company for lubricating oil, of Nottingham-Wrenn Company for coal, of J. T. Beveridge for conveying coal and other necessaries to the dredge, and of A. E. Pittman & Son for a gas engine for pumping water from the dredge, etc., amply sustains the conclusions of the master. These articles, he finds, were all furnished, and labor performed, on the credit of the dredge, the testimony sustains this finding. They all come clearly within the definition of necessary repairs, supplies, and services, constituting maritime liens of high order. He finds that several of the libelants were assured by Mitchell that there were no liens or claims on the dredge; "that he had spent all the money he had in constructing the dredge—sixty odd thousand dollars—that he had made up North."

While these declarations are not binding upon the libelants who constructed the dredge, or furnished materials for her construction, they are not denied. They illustrate the wisdom of the well-settled principle that, when one of two innocent parties must suffer, the injury will be imposed upon the one who put it into the power of the wrongdoer to cause the loss. The libelants who constructed the dredge surrendered it to Mitchell, who, it seems, was insolvent, and enabled him to represent it in a foreign port as his property, free of liens; whereas. in truth, if libelants' contention is correct, it was literally shielded over with secret liens for amounts in excess of its value. It seems that the statute in force in Pennsylvania gives a lien "for construction work." 26 Cyc. 763 (note 96). This state statutory lien they could have enforced before surrendering the possession of the dredge, or before it was carried away from the shipyard. They elected not to do so, but permitted the dredge to go on her voyage into a foreign port as an unincumbered maritime entity. If, by reason of this course, voluntarily taken by them, innocent persons, acting as they were justified in doing, furnished the dredge with articles necessary for her preservation and the performance of her maritime mission, they should,

upon plain principles of equity, be given priority in the payment of their claims.

An examination of the claim of libelant Howard S. Roberts discloses that a large part of it is based upon charges for commissions, computed upon the price of articles purchased and labor furnished in the construction of the dredge. It is difficult to entirely avoid the thought which comes from the peculiar condition disclosed by the record. It appears that a man having a valuable government contract, the performance of which required a suction dredge of considerable proportions, purchased an "old hull" and made a contract for her construction, or, if preferred, her conversion, into such a dredge. He incurs an indebtedness of $24,000, none of which, it is claimed, has been paid, and for none of which is any security taken, and with this burden upon her she is permitted, under the conditions found by the master, to leave her domicile of origin in the possession of an owner who, as found by the master, was without funds with which to provide for her safety, or to begin her operations at Beaufort. There is an absence of evidence that anything was said by Mitchell, or any of the libelants furnishing materials for construction, about looking to the dredge for payment. Although all of the debts were contracted at Philadelphia prior to May 11, 1911, no proceedings were instituted to enforce their payment until August 28, 1911, when Howard S. Roberts filed his libel; the others following during the months of October and November. Edmund H. Mitchell, pending this suit, filed his petition in bankruptcy in the District Court for the Southern District of New York. His schedule shows only nominal assets.

A careful examination of the testimony taken by the master strongly impresses my mind with the conviction that the libelants, whose claims were based upon transactions had with Mitchell while the dredge was under construction, were looking to him personally for payment. He was not examined as a witness. A court of equity, in the adjustment of equitable liens, having regard to the inherent merits of the claimants, in the light of all the facts and circumstances disclosed by this record, would, I think, be compelled, upon the application of well-settled principles, to give priority to those claimants who furnished the supplies and performed the labor which were indispensable and absolutely necessary to enable the dredge to perform the work for which it was constructed. The claim for priority finds strong support on this ground; but I am of the opinion, for the reasons stated, that the claims originating prior to May 11, 1911, are for construction, and therefore not maritime liens. It has been frequently held by courts of admiralty that, after discharging the maritime liens upon a vessel which has been sold under the process of the court, if any balance remains in the hands of the court, it will be paid to libelants who have established debts not coming within the jurisdiction. This is because the court has seized and disposed of the res, and, as here, the owner is insolvent.

This opinion has been drawn out to an unusual, and probably unreasonable, length. Many of the questions presented upon the somewhat peculiar facts, in the light of the change wrought in the law of the

statute of June, 1910, are not free from difficulty and doubt. The amounts involved are to the parties interested large, and the result of the litigation, unfortunately too long delayed, of much importance. A decree may be drawn in accordance with the views expressed herein.